information and belief, actually signed by Mrs. Beck. In that affidavit of support, made under penalty of perjury, the Becks stated that plaintiff was a family friend. This was not true. Plaintiff was an employee of companies owned, controlled, and operated by the Becks.

52. In their affidavit of support, made under penalty of perjury, the Becks stated that Mr. Beck would sponsor and provide financial support for plaintiff. This was not true. Mr. Beck did not intend to provide and did not in fact provide any financial support for plaintiff. To the contrary, when Mr. Beck signed this affidavit under penalty of perjury, he and his wife were charging plaintiff $500 per month to share a bedroom with another Beck employee. Mr. Beck and his wife had also required plaintiff to pay the thousands of dollars in tuition to a "school" to get certified as a student. Upon information and belief, the "school" that received plaintiff's "tuition" payments paid part of that money back to the Becks as a kickback.

53. In their affidavit of support, the Becks stated under penalty of perjury that Mr. Beck had never before submitted an affidavit of support for anyone. Upon information and belief, this statement was false or at best grossly misleading. Since 2001, the Becks and companies they own and control had submitted more than 750 applications for non-immigrant visas, including affidavits of support.

54. Together with their false and fraudulent affidavit of support, the Becks submitted an account balance summary from Chase Bank for bank accounts owned by defendant Gramercy Group Four LLC. The Becks submitted this account summary as evidence that plaintiff's sponsor had sufficient resources to provide for his support while he was "studying" in the United States. This representation was also false. Defendant

Gramercy Group Four LLC never intended to provide and never actually provided any support for plaintiff. Defendant Gramercy Group Four LLC was just another corporate entity that the Becks used when submitting false and fraudulent visa applications to conceal the fact that all the applications were actually coming from the Becks themselves.

55. The Becks also breached their contractual obligations to take all reasonable steps to ensure that plaintiff obtained the relevant authorizations to work legally in the United States when they submitting false and fraudulent statements to the Social Security Administration.

56. On or about July 6, 2010, Mrs. Beck signed a letter to the Social Security Administration representing that plaintiff would be employed by her company as a clerk. This was not true. The Becks did not intend for plaintiff to work as a clerk. In fact, when this letter was submitted to the government, the Becks had already signed a contract with a clinic in New Jersey to employ plaintiff at the clinic as a Physical Therapy Aide.

57. In her letter to the Social Security Administration, Mrs. Beck represented that plaintiff would work no more than 20 hours per week. This was not true. In their contract with the clinic in New Jersey, the Becks had already committed that plaintiff would work full time (40 hours or more per week).

58. When the Social Security Administration rejected the application for a social security number, Mrs. Beck prepared another letter to the Social Security Administration, dated July 23, 2010. Mrs. Beck instructed that this second letter, which contained the same material misrepresentations as the first, be submitted to a different office of the Social Security Administration.

59. Upon information and belief, the Becks and their companies have engaged in this same pattern and practice of fraudulent and illegal conduct with respect to large numbers of non-immigrant employees on a continuous basis.

60. Upon information and belief, the Becks and their companies have submitted more than 969 Labor Condition Applications (LCAs) for H-1B visas since 2001 through different corporate entities they own and control, including defendants Medical Dynamic, Oasis, and APMI.

61. In 2011 and 2012 alone, the Becks and their companies submitted at least 16 LCAs for Physical Therapy Rehab Managers, Physical Therapy Program Services Managers, and Rehab Managers. Upon information and belief, these submissions were false because the Becks and their companies never intended to employ, and never actually employed anyone as a Physical Therapy Rehab Manager, Physical Therapy Program Services Manager, or a Rehab Manager.

62. Upon information and belief, the Becks and their companies used "manager" titles to mislead the U.S. Department of Labor and the USCIS into believing that these employees would not have direct contact with patients – and therefore would not require to be licensed as physical therapists – when the Becks intended to employ these individuals, and in fact employed these individuals as Physical Therapy Aides whose job responsibilities included direct contact with patients.

63. In their LCAs and petitions for Physical Therapy Rehab Managers, Physical Therapy Program Services Managers, and Rehab Managers, the Becks and their companies represented that these "managers" would be paid a minimum of between $35.53 and $37.02 per hour. Upon information and belief, the Becks and their companies

18

never intended to pay such hourly rates to these employees and in fact paid these "managers" at much lower hourly rates.

64. Upon information and belief, the Becks required all of their non-immigrant employees to sign employment contracts substantially similar to the employment contracts signed by plaintiff. These standard Beck employment contracts contained the same or similar Indentured Servant Clause found in the standard contracts that the Becks required plaintiff to sign. As a result, these other non-immigrant employees faced the same threat of serious harm, as defined in the Trafficking Victims Protection Act, as plaintiff.

E. **The Becks Deprive Plaintiff of His Notice, Compensation and Repatriation Rights Under Federal Law**

65. On March 12, 2013, Mrs. Beck called plaintiff and threatened to withdraw his H-1B visa application unless he returned to work immediately as a Physical Therapy Aide earning less than half the prevailing wage for a Physical Therapy Rehab Manager.

66. Plaintiff reminded Mrs. Beck that she had granted him a leave of absence to study for a licensing exam. Although Mrs. Beck had signed a formal document granting the leave of absence, she demanded that plaintiff return to work immediately or he would lose his H-1B visa.

67. Between March 12 and March 21, 2013, Mrs. Beck instructed Jeffrey Samonte, the scheduling manager at her companies, to call plaintiff daily with assignments to work as a Physical Therapy Aide for only $15 per hour. Concerned that he might lose his H-1B visa, plaintiff agreed to take on the assignments even though he was trying to study for the licensing exam.

68.     The assignments turned out to be fictitious and the calls were made solely for the purpose of harassing plaintiff. None of the assignments ever materialized. On some occasions, Mr. Samonte told plaintiff to show up to work at a specific clinic early in the morning only to withdraw the assignment at the last minute. On other occasions, Mr. Samonte did not even try to hide the harassing nature of his calls, even calling plaintiff at 10:00 a.m. for an assignment that was supposed to start at 8:00 a.m. on the same day.

69.     On March 21, 2013, Mrs. Beck told plaintiff over the telephone that she had not yet withdrawn his H-1B application, but that she planned to do so unless he came back to work for her full time.

70.     When plaintiff again reminded Mrs. Beck that she had authorized his leave of absence in writing, and that he was considering a lawsuit to reveal the Becks' illegal activities, the Becks retaliated against plaintiff by sending an intentionally misleading letter to the USCIS withdrawing their I-129 petition for plaintiff's H-1B visa.

71.     In their letter withdrawing the petition, the Becks asserted that plaintiff had "not reported to work," thereby giving the false impression that plaintiff was absent without leave when, in fact, Mrs. Beck had personally authorized his leave in writing.

72.     While the Becks notified USCIS that they were withdrawing plaintiff's H-1B petition, they never formally terminated plaintiff's employment with their companies.

73.     When an H-1B worker is terminated prior to the expiration of the work authorization, the employer must take and document three separate steps to establish a bona fide termination and end its obligation to pay wages: (1) provide clear written notice of termination; (2) notify USCIS of the separation of the employee; and (3) offer