UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
LESTER LEE JAVIER,

                      Plaintiff,

-vs-

MARISSA TEVES BECK, HENRY R. BECK,
MEDICAL DYNAMIC SYSTEMS, INC., OASIS
PROFESSIONAL MANAGEMENT GROUP, INC.,
ADVANCED PROFESSIONAL MARKETING, INC.,
GRILL 21 LLC, PAN DE SAL LLC, and GRAMERCY
GROUP FOUR LLC,

                      Defendants.
------------------------------------------------------------------X

**AMENDED COMPLAINT**

PLAINTIFF DEMANDS A JURY ON ALL ISSUES TO BE TRIED

13 CIV 2926 (WHP)

Plaintiff LESTER LEE JAVIER, by his undersigned attorney, as and for his Complaint against the defendants, alleges as follows:

1. This is an action for damages and other remedies on behalf of a non-immigrant worker who was cheated out of his wages, forced to pay illegal fees, held in indentured servitude, and retaliated against in violation of the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201, *et seq.*, the Trafficking Victims Protection Act (TVPA), 18 U.S.C. § 1589 *et seq.*, the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961, *et seq.*, and various state and local laws.

2. Defendant Marissa Teves Beck is a recruiter with an ugly track record of illegally abusing and mistreating non-immigrant workers. In 2008, the U.S. Department of Labor issued a determination letter finding that she and a company she controlled had cheated employees out of almost $3 million in wages. The Department of Labor also determined that Mrs. Beck had threatened employees with lawsuits and loss of their legal

status – and actually commenced lawsuits against them – when they complained of her illegal conduct.

3. In 2009, this Court entered a permanent injunction against Mrs. Beck prohibiting her and her company from future violations of the FLSA's overtime and recordkeeping provisions. She was also ordered to advise employees of their rights under the FLSA, in particular their right to engage in protected activity without fear of retaliation.

4. Despite having been caught by the government in 2008 and enjoined by this Court in 2009, Mrs. Beck has continued her illegal activity and willfully violated this Court's permanent injunction. She has done this by hiding behind the perceived legitimacy of her husband, Henry R. Beck – a Vice President with The Corcoran Group – and by using a web of corporate entities purportedly run by her husband, but actually managed and controlled by Mrs. Beck herself.

5. Plaintiff Lester Lee Javier is one of the victims of the Becks' illegal and abusive treatment of non-immigrant workers. The Becks' abusive and illegal conduct includes:

   a. illegally charging plaintiff thousands of dollars in fees for an H-1B visa application when federal law requires that such fees be paid only by the employer and not passed on to the worker or any third party;

   b. falsely representing to the federal government that plaintiff, as an H-1B applicant, would be paid at least the prevailing wage, when the Becks intended to pay and actually paid plaintiff less than half of that wage;

c. failing and refusing to pay overtime to plaintiff when he worked more than 40 hours during a workweek;

d. creating and maintaining false and fraudulent records of employee wages and hours as part of a scheme to deprive plaintiff of the compensation he was entitled to receive under his employment contracts and federal law;

e. requiring plaintiff, as a condition of employment and visa sponsorship, to execute a $15,000 confession of judgment payable to the Becks or companies they controlled if plaintiff stopped working for any reason other than his death or disability – in other words, requiring plaintiff to become an indentured servant;

f. breaching their contracts with plaintiff and violating federal law by filing multiple false and fraudulent documents with the federal government in support of applications for visas and social security numbers;

g. manipulating, controlling, and coercing plaintiff and other employees to give up their legal rights by firing and threatening to fire, without the notice and benefits required by federal immigration laws, any employee who questioned the Becks' illegal and abusive conduct;

h. manipulating, controlling, and coercing plaintiff and other employees to give up their legal rights by filing and threatening to file lawsuits against any employee who questioned the Becks' illegal and abusive conduct;

i. manipulating, controlling, and coercing plaintiff and other employees to give up their legal rights by withdrawing and threatening to withdraw the H-1B visa application of any employee who questioned the Becks' illegal and abusive conduct;

j. withdrawing the application for plaintiff's H-1B visa on false pretenses in retaliation for his assertion of his legally-protected rights, and refusing to provide plaintiff with the termination notice and benefits required by federal immigration laws.

6. The Becks' mistreatment of plaintiff is not an isolated incident, but part of a much larger and continuous illegal enterprise. For years, the Becks have engaged in an illegal scheme involving immigration fraud, perjury, extortion, willful violations of this Court's permanent injunction, mail fraud, wire fraud, and violations of the Fair Labor Standards Act (FLSA) and the Trafficking Victims Protection Act (TVPA) affecting hundreds of non-immigrant employees.

7. Upon information and belief, the Becks and their companies have filed more than 750 applications for H-1B visas since 2001, and many of those applications have been based on the Becks' willfully false and fraudulent submissions to the federal government.

8. The Becks have carried out their fraudulent and illegal scheme through a network of companies that they own and control, including the corporations and limited liability companies named as defendants in this action. Treating employees like their personal property, the Becks use employees at different companies depending on their personal wishes and needs. For example, when the Becks did not have enough work for plaintiff as a Physical Therapy Rehab Manager or Physical Therapy Aide, they refused to pay him. To earn a living, he had no choice but to work as a dishwasher, delivery boy, and cook at one the Becks' restaurants, defendant Grill 21. Although plaintiff was an

employee of defendant Medical Dynamic Systems, Inc., the Becks also had him work for defendant Advanced Professional Marketing, Inc. and the Becks' relatives.

9. Disregarding corporate forms and formalities, the Becks dominate the corporate defendants to cheat non-immigrant workers out of their wages, overtime payments, and contractual rights to legitimate immigration assistance. The Becks' continuous fraudulent and illegal conduct includes creating and maintaining false hours and wages records, making false representations under oath to the federal government, demanding and concealing illegal payments from non-immigrant workers, and employing non-immigrant workers in positions inconsistent with their immigration status and at wages below the prevailing wages for their job positions.

### Jurisdiction and Venue

10. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), 29 U.S.C. § 216 (b) (FLSA), 18 U.S.C. § 1595(a) (civil trafficking), and 18 U.S.C. § 1964(c) (RICO). This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 because the state law claims form part of the same case or controversy as the federal law claims.

11. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to plaintiffs' claims occurred in this District, and pursuant to 18 U.S.C. § 1965(a) because some or all of the defendants reside, are found, have agents, and/or transact their affairs in this District.

## The Parties

12. Plaintiff LESTER LEE JAVIER ("Javier") is a graduate of Our Lady of Fatima University in Valenzuela City, Philippines, where he earned a Bachelor of Science degree in physical therapy. He was recruited by defendant Marissa Teves Beck and employed by several of the corporate defendants, including most recently by defendant Medical Dynamic Systems Inc. as a Physical Therapy Rehab Manager.

13. Defendant MARISSA TEVES BECK ("Mrs. Beck") is an individual with a track record of flagrantly abusing and violating the rights of non-immigrant workers in the United States. Defendant Mrs. Beck at all relevant times exercised managerial or supervisory responsibility for personnel decisions at defendants Medical Dynamic Systems, Inc., Oasis Professional Management Group, Inc., Advanced Professional Marketing, Inc., Grill 21 LLC, Pan de Sal LLC, and Gramercy Group Four LLC. Upon information and belief, defendant Mrs. Beck owned and/or controlled each of these corporate defendants at all times relevant to this complaint.

14. Defendant HENRY R. BECK ("Mr. Beck") is Vice President of The Corcoran Group and husband of defendant Mrs. Beck. Defendant Mr. Beck was at all relevant times the Chief Executive Officer of defendants Medical Dynamic Systems, Inc. and Oasis Professional Management Group, Inc. Defendant Mr. Beck at all relevant times exercised managerial or supervisory responsibility for personnel decisions at defendants Medical Dynamic Systems, Inc., Oasis Professional Management Group, Inc., Advanced Professional Marketing, Inc., Grill 21 LLC, Pan de Sal LLC, and Gramercy Group Four LLC. Upon information and belief, defendant Mr. Beck owned and/or controlled each of these corporate defendants at all times relevant to this complaint.

15. Defendant MEDICAL DYNAMIC SYSTEMS, INC. ("Medical Dynamic") is and was at all relevant times a corporation organized under the laws of the State of New York with its principal place of business at 229 East 21st Street, Suite 1, New York, New York 10010. Upon information and belief, defendant Medical Dynamic is owned and/or controlled by defendants Mrs. & Mr. Beck.

16. Defendant OASIS PROFESSIONAL MANAGEMENT GROUP, INC. ("Oasis") is and was at all relevant times a corporation organized under the laws of the State of New York with its principal place of business at 229 East 21st Street, Suite 1, New York, New York 10010, the same place of business as defendant Medical Dynamic. Upon information and belief, defendant Oasis is owned and/or controlled by defendants Mrs. & Mr. Beck.

17. Defendant ADVANCED PROFESSIONAL MARKETING, INC. ("APMI") is and was at all relevant times a corporation organized under the laws of the State of New York with its principal place of business at 229 East 21st Street, Suite 1, New York, New York 10010, the same place of business as defendants Medical Dynamic and Oasis. Defendant Mrs. Beck is and was at all relevant times the President and Chief Executive Officer of defendant APMI. Upon information and belief, defendant APMI is owned and/or controlled by defendants Mrs. & Mr. Beck.

18. Defendant GRILL 21 LLC ("Grill 21") is and was at all relevant times a limited liability company organized under the laws of the State of New York with its principal place of business at 346 East 21st Street, New York, New York 10010. Defendant Grill 21 at all relevant times operated a restaurant at that location. Upon

information and belief, defendant Grill 21 is owned and/or controlled by defendants Mrs. and Mr. Beck.

19. Defendant PAN DE SAL LLC ("Pan de Sal") is and was at all relevant times a limited liability company organized under the laws of the State of New York with its principal place of business at 245 East 21st Street, New York, New York 10010. Defendant Pan de Sal at all relevant times operated a restaurant at that location. Upon information and belief, defendant Pan de Sal is owned and/or controlled by defendants Mrs. & Mr. Beck.

20. Defendant GRAMERCY GROUP FOUR LLC ("Gramercy Group") is and was at all relevant times a limited liability company organized under the laws of the State of New York with a principal place of business at 278 First Avenue, New York, New York 10009. Upon information and belief, defendant Gramercy Group is owned and/or controlled by defendants Mrs. & Mr. Beck.

### Statement of Claims

21. In May 2011, defendant Marissa Teves Beck presented plaintiff Lester Lee Javier with a contract offering to employ plaintiff as a Physical Therapy Rehab Manager (the "2011 Contract"). The employer was defendant Medical Dynamic Systems, Inc. "together with its affiliates." The affiliates of defendant Medical Dynamic include defendants Oasis Professional Development Group, Inc., Advanced Professional Marketing, Inc., Grill 21 LLC, Pan de Sal LLC, and Gramercy Group Four LLC (collectively, the "Becks' Companies").

22. The Becks' Companies agreed to sponsor plaintiff for an H-1B visa and to take all reasonable steps to ensure that plaintiff obtained the relevant authorizations and

met the requirements to legally commence work in the United States. The Becks' Companies also agreed to take all reasonable steps to maintain plaintiff's legal status to work in the United States for the duration of the 2011 Contract. The duration of the 2011 Contract was three years.

23. An H-1B visa allows a non-immigrant to work in the United States on a temporary basis if certain conditions are met.

24. The employer must submit a Labor Conditions Application to the United States Department of Labor demonstrating that the employee will be paid the required wage for the position in the geographic region where the job is located. The required wage is the higher of the "actual wage" that is paid to other employees in this position or the "prevailing wage."

25. The Becks' Companies agreed in the 2011 Contract to pay plaintiff the higher of $35.53 per hour or the prevailing wage, with compensation increases negotiated every year. They also agreed to provide plaintiff with health insurance and other benefits.

26. Under the Immigration and Nationality Act, the employer is required to pay all the fees associated with an application for an H-1B visa. These fees include: a $325 application fee; a $750 or $1,500 training and scholarship fee; a $500 fraud prevention fee; and an additional $2,000 fee for employers who employ 50 or more employees in the United States with more than 50% of their employees in a non-immigrant visa status.

27. These H-1B visa fees must be paid by the employer and may not be passed on, directly or indirectly, to the employee or any third party. The Becks' Companies

agreed in the 2011 Contract to incur the cost of obtaining an H-1B visa for plaintiff and to ensure that he obtained any other relevant authorizations.

A. **The Becks Breach the Contract, Violate the FLSA and Immigration Laws, and Demonstrate Their Contempt for This Court's Permanent Injunction**

28. The Becks' Companies breached the 2011 Contract by failing to pay plaintiff the higher of $35.53 or the prevailing wage. Instead, the Becks' Companies paid plaintiff only $15 per hour, thereby depriving him of more than $20 per hour for each and every hour he worked.

29. The Becks and their companies also violated the FLSA and this Court's permanent injunction by creating and maintaining false and fraudulent hour and wage records with the purpose and effect of cheating plaintiff out of his base and overtime compensation.

30. Each week, plaintiff submitted timesheets to Gina Zuluaga, the Becks' office manager, who indicated her approval by signing the timesheets. The Becks then caused their companies to pay plaintiff by check. The checks, however, always listed the number of hours worked as less than half the number of hours that were actually worked and that were approved by Ms. Zuluaga.

31. For example, the timesheets for the week ending August 24, 2012, signed by Ms. Zuluaga, indicate that plaintiff worked for defendants at a clinic in New Jersey for a total of 36 hours that week. The paycheck issued by defendants, however, was for only 15.2 hours. Defendants paid plaintiff for only 15.2 hours to arrive at an effective hourly rate of only $15 per hour for the 36 hours that were actually worked.

32. The same reduction of hours appears on each and every paycheck plaintiff received from the Becks' Companies beginning with the first paycheck after he obtained an H-1B visa.

33. The purpose of reducing the number of hours reported on plaintiff's paycheck was to make it appear that plaintiff was receiving the $35.53 per hour required by the 2011 Contract and the immigration laws, when he was actually being paid only $15 per hour or less than half the required wage.

34. The effect of defendants' false and fraudulent wage and hours records was to deprive plaintiff of the wages he was entitled to be paid under both the 2011 Contract and the immigration laws. The effect was also to deprive plaintiff of his right under the FLSA to be paid one and one-half times his hourly rate during workweeks when he worked more than 40 hours. By cutting his hours in half for purposes of his paycheck, the defendants avoided ever recording that plaintiff had worked more than 40 hours in any workweek.

35. In addition to breaching the 2011 Contract and violating the FLSA and immigration laws, the defendants' acts of creating and maintaining false and fraudulent records of employee hours and wages demonstrated their willful contempt for this Court's permanent injunction. The permanent injunction requires that defendants Mrs. Beck and APMI "make, keep, and preserve adequate records of their employees and of the wages, hours, and other conditions" required by the FLSA and implementing regulations. The permanent injunction also requires that defendants APMI and Mrs. Beck compensate employees "for their employment in excess of the prescribed hours at rates not less than one and one-half times the employees' regular rates."

B. **The Becks Breach the Contract and Violate the Immigration Laws by Committing Immigration Fraud**

36. Shortly after presenting plaintiff with the 2011 Contract, the Becks submitted an I-129 Petition to the United States Citizenship and Immigration Service (USCIS) to obtain an H-1B visa on behalf of plaintiff. The application was submitted over the signature of defendant Mr. Beck. Upon information and belief, Mr. Beck's signature was actually signed by Mrs. Beck with her husband's knowledge and consent.

37. By signing the I-129 Petition for an H-1B visa, the Becks certified under penalty of perjury that the information contained in the petition and the evidence submitted with it were true and correct. In fact, the Becks' petition and evidence were false in every material respect.

38. The Becks certified under penalty of perjury that plaintiff would work full time as a Physical Therapy Rehab Manager for the higher of $35.53 per hour or the prevailing wage at Metro Sportsmed in Brooklyn, New York. The Becks certified that plaintiff was not required to hold a valid license as a physical therapist because he would not be providing direct patient care as a Physical Therapy Rehab Manager. In support of the petition, the Becks submitted a staffing and master services agreement between the Becks' Companies and Metro Sportsmed.

39. The Becks' submission to USCIS was false in every material respect. The Becks never intended to employ plaintiff as a Physical Therapy Rehab Manager, never intended to pay him $35.53 or the prevailing wage, and never intended that he would work at Metro Sportsmed in Brooklyn. When the Becks made these statements under penalty of perjury, they had already signed a contract for plaintiff to work as a physical therapy aide at a clinic in New Jersey. The clinic agreed to pay the Becks' Companies

$28 per hour for plaintiff's services, and the Becks intended to pay only $15 per hour to plaintiff. Contrary to their statements under penalty of perjury that plaintiff would not be providing direct patient care and would be acting only as a manager, plaintiff's responsibilities at the New Jersey clinic were exclusively providing direct patient care and involved no management responsibilities whatsoever.

40. By knowingly and willfully submitting false and fraudulent statements in connection with their application for an H-1B visa on plaintiff's behalf, the Becks and their companies breached their contractual obligation to take all reasonable steps to secure an H-1B visa and ensure that plaintiff obtained and maintained all relevant authorizations necessary to work legally in the United States.

41. The Becks and their companies also illegally charged plaintiff thousands of dollars for H-1B application fees that must be paid by the employer and may not be passed on, directly or indirectly, to the employee or any third party. Although plaintiff was technically employed by defendant Medical Dynamic, the Becks attempted to hide their fraud and illegality by instructing plaintiff to make the payments to defendant Oasis Professional Management Group, Inc. When defendant Oasis took thousands of dollars from plaintiff to pay for the Becks' H-1B application fees, defendant Oasis provided nothing in return to plaintiff.

C. **The Becks' Threatened and Actual Retaliation in Violation of the Trafficking Victims' Protection Act and the Immigration Laws**

42. The Becks repeatedly threatened to cause serious harm, as defined in the Trafficking Victims Protection Act, to plaintiff and any other non-immigrant employee who questioned their illegal conduct or attempted to leave their employ.

43. As a condition of employment and to obtain the Becks' promise of immigration assistance, plaintiff and other non-immigrant employees were required to agree to a confession of judgment for $15,000 in favor of the Becks' Companies (the "Indentured Servant Clause"). The Indentured Servant Clause provides that plaintiff and other non-immigrant employees must pay the Becks' Companies $15,000 if they stop working for the Becks for any reason other than the employee's death or disability.

44. This $15,000 penalty for leaving the Becks' employ represents more than 6 months of gross wages. It served as a constant threat of serious harm to plaintiff and any other non-immigrant employee who considered leaving the Becks' employ. The Becks reinforced that threat on a regular basis by reminding plaintiff and other employees that they would be sued for damages if they ever tried to leave.

45. The Becks also threatened to withdraw the H-1B visa petition of plaintiff and any other non-immigrant employee who questioned their illegal conduct or refused to work for less than half the required wage under the immigration laws. These threats were made directly by the Becks and their scheduling assistant, Jeffrey Samonte.

46. On several occasions, Mrs. Beck and Mr. Samonte told plaintiff that his H-1B petition would be withdrawn unless he continued to work for only $15 per hour at various locations in New York and New Jersey. Mr. Samonte repeatedly told plaintiff that the Becks are powerful people, and that plaintiff must do exactly what they want him to do or they would punish him. The punishments would include terminating his employment, withdrawing his H-1B petition, and commencing a lawsuit against him. Under the Trafficking Victims Protection Act, these constitute threats of serious harm.

D. **The Becks' Continuous Pattern of Fraudulent Conduct in Furtherance of Their Illegal Scheme to Profit at the Expense of Non-Immigrant Employees**

47. The Becks' mistreatment of plaintiff is part of a larger and continuous pattern of fraudulent and illegal conduct designed to enhance their profits at the expense of non-immigrant employees. The precise number of victims is known only to the Becks, but upon information and belief the victims number in the hundreds.

48. As evidenced by the U.S. Department of Labor's 2008 determination letter and this Court's 2009 permanent injunction, the Becks' illegal conduct began more than five years ago. The Becks' illegal conduct has continued unabated to the present and has, in fact, become even more pervasive.

49. For example, in January 2009, the Becks required plaintiff to sign an employment contract with defendant Medical Dynamic and its affiliates as a condition to receiving their immigration assistance (the "2009 Contract"). The 2009 Contract required defendants to take all reasonable steps to ensure that plaintiff obtained the relevant authorizations and met the requirements necessary to work legally in the United States for the duration of the 2009 Contract, which was three years. The Becks represented in the 2009 Contract that Medical Dynamic and its affiliates would incur "significant cost" to provide such immigration assistance.

50. Defendants breached their obligations under the 2009 Contract by charging plaintiff thousands of dollars to submit an application for plaintiff to obtain an F-1 (student) visa that would allow him to work only 20 hours per week, and by submitting false and fraudulent statements to the USCIS in support of their application.

51. As part of their application for an F-1 (student) visa, the Becks submitted a false and fraudulent affidavit of support purportedly signed by Mr. Beck but, upon

information and belief, actually signed by Mrs. Beck. In that affidavit of support, made under penalty of perjury, the Becks stated that plaintiff was a family friend. This was not true. Plaintiff was an employee of companies owned, controlled, and operated by the Becks.

52. In their affidavit of support, made under penalty of perjury, the Becks stated that Mr. Beck would sponsor and provide financial support for plaintiff. This was not true. Mr. Beck did not intend to provide and did not in fact provide any financial support for plaintiff. To the contrary, when Mr. Beck signed this affidavit under penalty of perjury, he and his wife were charging plaintiff $500 per month to share a bedroom with another Beck employee. Mr. Beck and his wife had also required plaintiff to pay thousands of dollars in tuition to a "school" to get certified as a student. Upon information and belief, the "school" that received plaintiff's "tuition" payments paid part of that money back to the Becks as a kickback.

53. In their affidavit of support, the Becks stated under penalty of perjury that Mr. Beck had never before submitted an affidavit of support for anyone. Upon information and belief, this statement was false or at best grossly misleading. Since 2001, the Becks and companies they own and control had submitted more than 750 applications for non-immigrant visas, including affidavits of support.

54. Together with their false and fraudulent affidavit of support, the Becks submitted an account balance summary from Chase Bank for bank accounts owned by defendant Gramercy Group Four LLC. The Becks submitted this account summary as evidence that plaintiff's sponsor had sufficient resources to provide for his support while he was "studying" in the United States. This representation was also false. Defendant

Gramercy Group Four LLC never intended to provide and never actually provided any support for plaintiff. Defendant Gramercy Group Four LLC was just another corporate entity that the Becks used when submitting false and fraudulent visa applications to conceal the fact that all the applications were actually coming from the Becks themselves.

55. The Becks also breached their contractual obligations to take all reasonable steps to ensure that plaintiff obtained the relevant authorizations to work legally in the United States when they submitting false and fraudulent statements to the Social Security Administration.

56. On or about July 6, 2010, Mrs. Beck signed a letter to the Social Security Administration representing that plaintiff would be employed by her company as a clerk. This was not true. The Becks did not intend for plaintiff to work as a clerk. In fact, when this letter was submitted to the government, the Becks had already signed a contract with a clinic in New Jersey to employ plaintiff at the clinic as a physical therapy aide.

57. In her letter to the Social Security Administration, Mrs. Beck represented that plaintiff would work no more than 20 hours per week. This was not true. In their contract with the clinic in New Jersey, the Becks had already committed that plaintiff would work full time (40 hours or more per week). At the same time, the Becks had already entered into a contract with plaintiff for him to work at least 40 hours per week.

58. When the Social Security Administration rejected the application for a social security number, Mrs. Beck prepared another letter to the Social Security Administration, dated July 23, 2010. Mrs. Beck instructed that this second letter, which contained the same material misrepresentations as the first, be submitted to a different office of the Social Security Administration.