UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
LESTER LEE JAVIER,

                       Plaintiff,           :         13 Civ. 2926 (WHP)

                                   :

        -vs-

                                   :

MARISSA TEVES BECK, HENRY R. BECK,
MEDICAL DYNAMIC SYSTEMS, INC., OASIS     :
PROFESSIONAL MANAGEMENT GROUP, INC.,
ADVANCED PROFESSIONAL MARKETING, INC.,   :
GRILL 21 LLC, PAN DE SAL LLC, and GRAMERCY
GROUP FOUR LLC,                        :

                 Defendants.       :
------------------------------------------------------------------------X

## PLAINTIFF'S MEMORANDUM OF LAW
## IN OPPOSITION TO MOTION TO DISMISS

**JOHN HOWLEY, ESQ.**
*Attorney for Plaintiff*
350 Fifth Avenue, 59th Floor
New York, New York 10118
(212) 601-2728
jhowley@johnhowleyesq.com

## TABLE OF CONTENTS

**Argument**

Point I

THE FAIR LABOR STANDARDS ACT (FLSA) CLAIMS
ARE ADEQUATELY PLEADED..................................................... 1

A.    The Amended Complaint States Claims
      for Unpaid Time and Overtime............................................. 1

B.    The Corporate Defendants Are Joint Employers
      as Defined by the FLSA..................................................... 4

C.    The Individual Defendants Are Personally Liable
      for FLSA Violations......................................................... 6

Point II

THE TRAFFICKING VICTIMS PROTECTION ACT (TVPA)
CLAIMS ARE ADEQUATELY PLEADED...................................... 8

A.    Defendants Threatened Plaintiff with Serious Harm
      as Defined by the TVPA.................................................... 8

B.    All Defendants Are Liable for Violations of the TVPA................ 11

Point III

THE RICO CLAIMS ARE ADEQUATELY PLEADED..................... 11

A.    Plaintiff Alleges a RICO Enterprise Controlled
      by RICO Persons.............................................................. 12

B.    The Amended Complaint Alleges More Than Two
      Predicate Acts................................................................ 14

C.    The Amended Complaint Alleges a Pattern
      of Racketeering Activity.................................................... 17

D.    The Amended Complaint Adequately Alleges
      a RICO Conspiracy........................................................... 19

E.    The Amended Complaint Alleges RICO Injuries....................... 21

Point IV

**THE BREACH OF CONTRACT CLAIMS
ARE ADEQUATELY PLEADED**............................................... 22

POINT V

**THE FRAUD, UNJUST ENRICHMENT, AND QUANTUM
MERUIT CLAIMS ARE NOT DUPLICATIVE OF THE
BREACH OF CONTRACT CLAIMS**........................................... 24

Conclusion.................................................................... 25

## TABLE OF AUTHORITIES

**CASES**

*Ashcroft v. Iqbal*, 566 U.S. 662 (2009)................................................................ 2

*H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229 (1989).............................. 19

*Imperator Realty Co. v. Tull*, 228 N.Y. 447, 127 N.E. 263 (1920)................................ 23

*Barfield v. N.Y.C. Health & Hosps. Corp.*, 537 F.3d 132 (2d Cir. 2008)......................... 4

*Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158 (2001)................................... 12

*DeSilva v. North Shore-Long Island Jewish Health Sys., Inc.*, 770 F. Supp. 2d 497
(E.D.N.Y. 2011)....................................................................................... 22

*Goldberg v. Whitaker House Coop., Inc.*, 366 U.S. 28 (1961)..................................... 5

*Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21 (2d Cir. 1990)............................ 21

*Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132 (2d Cir. 1999).................................... 7

*Kuebel v. Black & Decker, Inc.*, 643 F.3d 352 (2d Cir. 2011)..................................... 3

*Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106 (2d Cir. 2013)................. 2

*Nassau Trust Co. v. Montrose Concrete Prods. Corp.*, 56 N.Y.2d 175, 451 N.Y.S.2d 663
(1982)................................................................................................ 23, 24

*Nichols v. Mahoney*, 608 F. Supp. 2d 526 (S.D.N.Y. 2009)....................................... 12, 13

*Rutherford Food Corp. v. McComb*, 331 U.S. 722 (1947)........................................... 5

*United States Fire Ins. Co. v. United Limousine Serv., Inc.*, 303 F. Supp. 2d 432 (S.D.N.Y.
2004).................................................................................................. 20

*United States v. Aulicino*, 44 F.3d 1102 (2d Cir. 1995)........................................... 19

*United States v. Bradley*, 390 F.3d 145 (1st Cir. 2004)........................................... 10

*United States v. Calimlim*, 538 F.3d 706, 712 (7th Cir. 2008).................................... 8,9

*United States v. Coonan*, 938 F.2d 1553 (2d Cir. 1991)........................................... 13

*United States v. Dann*, 652 F.3d 1160 (9th Cir. 2011)............................................ 8,9

*United States v. Djoumessi*, 538 F.3d 547 (6th Cir. 2008)............................................. 10

*Young v. Cooper Cameron Corp.,* 586 F.3d 201 (2d Cir. 2009)..................................... 2

*Zheng v. Liberty Apparel Co.*, 355 F.3d 61 (2d Cir. 2003)........................................... 4,6

**STATUTES AND REGULATIONS**

18 U.S.C. § 1341............................................................................................ 15

18 U.S.C. § 1343............................................................................................ 15

18 U.S.C. § 1351a........................................................................................... 15

18 U.S.C. § 1546............................................................................................ 15

18 U.S.C. § 1584............................................................................................ 14

18 U.S.C. § 1589............................................................................................ 14

18 U.S.C. § 1590............................................................................................ 14

18 U.S.C. § 1961............................................................................................ 14

18 U.S.C. § 1961(3)........................................................................................ 12

18 U.S.C. § 1961(4)........................................................................................ 12

18 U.S.C. §§ 1589, *et seq*............................................................................ 8

29 C.F.R. § 785.27......................................................................................... 2

29 U.S.C. § 203(d)......................................................................................... 4, 6

29 U.S.C. §§ 201, *et seq*............................................................................. 1

42 U.S.C. § 1383a.......................................................................................... 14

8 C.F.R. § 214.2(h)(11) ................................................................................. 10

New York Penal Law § 155.05(2)(e)............................................................... 16, 17

<u>Argument</u>

### Point I

### THE FAIR LABOR STANDARDS ACT (FLSA) CLAIMS ARE ADEQUATELY PLEADED

Plaintiff alleges that the defendants violated the Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 201, *et seq.*, by failing to pay him for all the hours he worked, and by failing to pay him overtime at 1.5 times his hourly rate for hours worked in excess of 40 hours per week. Amended Complaint ("Am. Compl."), First Claim for Relief, ¶¶ 78-90. Plaintiff further alleges that all of the corporate defendants are liable for these violations as joint employers, *id.* ¶¶ 79-81, and that the individual defendants are personally liable as employers and because they dominated and used the corporate entities to commit fraud, *id.* ¶¶ 8-9, 80.

### A.   The Amended Complaint States Claims for Unpaid Time and Overtime

The FLSA requires employers to pay employees at least the minimum wage for all hours worked. 29 U.S.C. § 206. The FLSA also requires employers to pay overtime to employees who work more than 40 hours per week "at a rate not less than one and one-half times the regular rate at which he is employed." *Young v. Cooper Cameron Corp.,* 586 F.3d 201, 204 (2d Cir. 2009) (citations omitted).

The Second Circuit has held that, "in order to state a plausible FLSA overtime claim, a plaintiff must sufficiently allege 40 hours of work in a given workweek as well as some uncompensated time in excess of the 40 hours." *Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 114 (2d Cir. 2013). "Determining whether a plausible claim has been pled is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Id.* (*quoting Ashcroft v. Iqbal*, 566 U.S.

662, 679 (2009)). Under this case-specific approach, "an approximation of overtime hours worked" is sufficient to meet the plausibility standard. *Id.* at 114 n.7.

Plaintiff has pleaded with particularity, on a week-by-week basis, the specific weeks when he worked more than 40 hours but was paid for less than 40 hours, and the specific number of hours he actually worked during each of those weeks. Am. Compl. ¶¶ 89(a)-(m). Plaintiff has also alleged in detail when and how these hours were worked. *Id.* ¶¶ 84-85.

First, defendants required plaintiff to attend an English language training school. *Id.* ¶ 85. Contrary to defendants' argument (Def. Br. at 8), this time was not exempt from compensation under regulations governing "lectures, meetings, training programs and similar activities," because that exemption applies only if plaintiff's attendance was "in fact voluntary." 29 C.F.R. § 785.27. Here, defendants required that plaintiff attend this school – even though he already spoke English – because the defendants were paid kickbacks by the school, and plaintiff's attendance allowed them to submit fraudulent applications for student visas instead of the working visas they agreed to obtain. Am. Compl. ¶ 85.

Second, defendants failed to compensate plaintiff for time spent on work assignments for the defendants that were not billable to the third-party clinics where plaintiff was assigned. These tasks included "traveling to and meeting with representatives of medical facilities for interviews and to convince the medical facilities to retain defendants" and "encourag[ing] existing clients to use more services or personnel, and follow[ing] up on payments by clients of invoices." *Id.* ¶ 84.

Defendants' argument that plaintiff's timesheets are conclusive proof of the hours worked for purposes of this motion to dismiss ignores the Second Circuit's controlling precedent in *Kuebel v. Black & Decker, Inc.,* 643 F.3d 352, 363 (2d Cir. 2011) (reversing dismissal of FLSA claims and rejecting the argument that an employee is always bound by his timesheets where the evidence demonstrates that the timesheets did not reflect all hours worked). Plaintiff here was employed by defendants to provide services at third-party clinics that contracted with defendants. Am. Compl. ¶ 83. The timesheets reflected work that plaintiff performed at those third-party clinics, and they were used to bill those third-party clinics for plaintiff's time. The additional time that defendants required plaintiff to spend on marketing and administrative tasks, and attending a worthless school, was not recorded on these timesheets because that time was not chargeable to the third-party clinics.

Defendants' attempt to use timesheets to disprove plaintiff's allegations on this motion to dismiss also ends up proving too much. For example, defendants argue that plaintiff could not have worked 42 hours during the period from May 12, 2011 to May 19, 2011 because he "was approved for a two week leave" to study for a licensing exam. (Def. Br. at 9). This argument serves only to corroborate plaintiff's allegation that defendant Marissa Beck thwarted plaintiff's efforts to obtain his license – which would have allowed him to leave her employ – by granting leaves of absences only to suddenly demand that he return to work. Am. Compl. ¶¶ 65-70. The timesheets produced by defendants prove only that plaintiff was, in fact, required to work during a period of time when he should have been allowed to study for licensing exams.

3

Lastly, when defendants argue that plaintiff was paid the minimum wage even if he worked al the hours alleged, they are ignoring the fact that plaintiff's compensation was reduced when defendants required him to pay thousands of dollars in worthless school fees and illegally charged him thousands of dollars for immigration fees that the immigration laws require the employer to pay and not pass on to the employee. *Id.* ¶¶ 5(a), 41, 50, 52, 95. When these illegal fees are deducted from the total compensation paid, and that net compensation number is divided by the actual number of hours worked, plaintiff was not paid the minimum wage for all hours worked.

**B.    The Corporate Defendants Are Joint Employers as Defined by the FLSA**

It is undisputed that defendant Medical Dynamic qualifies as an "employer" for purposes of liability under the FLSA. However, five of the corporate defendants – Oasis, APMI, Grill 21, Pan de Sal, and Gramercy Group Four – move to dismiss plaintiff's FLSA claims by arguing that they were not employers.

The FLSA defines an "employer" to include "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). "This definition is necessarily a broad one, in accordance with the remedial purpose of the FLSA," *Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 66 (2d Cir. 2003), and it "recognize[s] the possibility of joint employment for purposes of determining FLSA responsibilities." *Barfield v. N.Y.C. Health & Hosps. Corp.*, 537 F.3d 132, 141 (2d Cir. 2008).

Consistent with the broad definition in the statute, the Second Circuit has rejected any rigid tests in favor of an examination of "the circumstances of the whole activity . . . viewed in light of 'economic reality.'" *Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 71 (2d

Cir. 2003) (citing *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947);

*Goldberg v. Whitaker House Coop., Inc.*, 366 U.S. 28, 33 (1961)).

The first economic reality in this case is found in the language of the employment

contracts drafted by the defendants. Both employment contracts state that the employer

is defendant Medical Dynamic "together with its affiliates." Am. Compl. ¶¶ 21, 203-06,

220-21. The Amended Complaint alleges that the "affiliates of defendant Medical

Dynamic include defendants Oasis Professional Development Group, Inc., Advanced

Professional Marketing, Inc., Grill 21 LLC, Pan de Sal LLC, and Gramercy Group Four

LLC." *Id.* ¶ 21.

The specific allegations in the complaint adequately allege that each of these

defendants is an affiliate of Medical Dynamic within the meaning of the employment

contracts. When it came time for plaintiff to pay fees for his immigration visas, he did

not make those payments to defendant Medical Dynamic, the purported "signatory" on

the contracts, but instead was directed to make those payments to defendant Oasis,

further evidence that Oasis was one of the "affiliates" in the employment agreements. *Id.*

¶ 41.

In support of their application to obtain a student visa for plaintiff, "the Becks

submitted an account balance summary from Chase Bank for accounts owned by

defendant Gramercy Group Four LLC . . . as evidence that plaintiff's sponsor had

sufficient resources to provide for his support." *Id.* ¶ 54. If, as defendants now assert,

Medical Dynamic was plaintiff's sole employer, then there would be no reason for a

different entity, defendant Gramercy Group Four, to supply evidence of its ability to

provide financial support for plaintiff as part of his visa application.

5

The Amended Complaint also alleges that plaintiff worked for all of the corporate defendants without any distinction or differentiation. For example, "when the Becks did not have enough work for plaintiff as a Physical Therapy Rehab Manager or Physical Therapy Aide," they put plaintiff "to work as a dishwasher, delivery boy, and cook at" defendant Grill 21 LLC. *Id.* ¶ 8. "[T]he Becks also had him work for defendant Advanced Professional Marketing, Inc." *Id.*

The Indentured Servant Clause in the employment contracts required plaintiff to pay $15,000 to "the Company" if he stopped working for any reason other than his death or disability. As drafted by the defendants, "the Company" is defined in the employment contracts as "Medical Dynamic . . . together with its affiliates, successors, and assigns." *Id.* ¶ 43. By defining "the Company" as including all of Medical Dynamics "affiliates," the defendants ensured that any of its affiliates could enforce the Indentured Servant Clause. Where, as here, the defendants took great care to ensure that each and every corporate defendant was protected by the employment contracts, they cannot now claim that none of the corporate defendants were employers.

## C.    The Individual Defendants Are Personally Liable for FLSA Violations

Defendants Marissa and Henry Beck move to dismiss the FLSA claims against them, as individuals, based on an argument that they did not "qualify as 'employers' for FLSA purposes." (Def. Br. at 7). As noted above, the FLSA defines an "employer" broadly to include "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d); *see also Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 66 (2d Cir. 2003). The Becks easily fit within that definition because, as the

Amended Complaint alleges, they made virtually every decision for the corporate defendants, including decisions on payment of compensation.

The Amended Complaint alleges that Marissa and Henry Beck personally completed and signed Labor Condition Certifications, visa petitions, and applications for social security cards that falsely described plaintiff's duties and compensation. Am. Compl. ¶¶ 46, 51-54, 56-58, 65-71. The Becks personally approved and then arbitrarily revoked plaintiff's leave of absence to study for licensing exams. *Id.* ¶¶ 66, 70. They personally threatened to terminate, and then actually terminated his employment and H-1B visa. *Id.* ¶¶ 65-77. These allegations plausibly show that Marissa and Henry Beck personally made all the important decisions concerning plaintiff's employment with their companies, including his compensation. They are more than sufficient to establish that these individual defendants "possessed the power to control the workers in question." *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999).

The Becks are also personally liable for the FLSA violations under a "piercing the corporate veil" theory. As the Amended Complaint alleges, they disregarded corporate forms and formalities, dominating and controlling the corporate defendants to cheat non-immigrant workers out of their wages, overtime payments, and contractual rights to legitimate immigration assistance. Am. Compl. ¶ 5. In addition to working for their companies, "the Becks also had [plaintiff] work for . . . the Becks' relatives," defendant Grill 21, and defendant APMI, based on their own personal wants. *Id.* ¶ 8. Accepting these allegations as true, this Court should not dismiss the FLSA claims against the Becks personally.

**Point II**

## THE TRAFFICKING VICTIMS PROTECTION ACT (TVPA)
## CLAIMS ARE ADEQUATELY PLEADED

The Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. §§ 1589, *et seq.*, prohibits schemes intended to cause an employee to believe that he will suffer "serious harm" if he does not continue to work for the employer. *United States v. Dann*, 652 F.3d 1160, 1169-70 (9th Cir. 2011). Recognizing that that the means used by modern-day traffickers are 'increasingly subtle,'" *id.* at 1169 (citation omitted), Congress defined "serious harm" very broadly to include: "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid that harm." 18 U.S.C. § 1589(c)(2).

### A.   Defendants Threatened Plaintiff with Serious Harm as Defined by the TVPA

The employment contracts at issue include a clause that required plaintiff to pay defendants $15,000 if he left their employ for any reason other than his death or disability. Am. Compl. ¶¶ 5(e), 43 (the "Indentured Servant Clause"). Defendants' threats to sue plaintiff for this $15,000 penalty if he stopped working for them was a threat of "serious harm" within the meaning of the TVPA. *See, e.g., United States v. Dann*, 652 F.3d 1160, 1171 (9th Cir. 2011) (threat that non-immigrant would owe $7,500 to employer if she left was a threat of "serious harm"); *cf. United States v. Calimlim*, 538 F.3d 706, 712, 714 (7th Cir. 2008) (threat to stop paying victim's poor family members constitutes serious harm).

Defendants' argument that they were merely warning of the possible adverse consequences of legitimate action ignores both the nature of the penalty they threatened to enforce and how they used threats to prevent plaintiff from gaining his freedom. The Indentured Servant Clause was an illegal penalty, not a valid liquidated damages clause, because the $15,000 penalty bore no relation to the actual cost of providing immigration assistance to plaintiff. Indeed, instead of incurring any costs on plaintiff's behalf, the Amended Complaint alleges that defendants charged plaintiff thousands of dollars in fees for the immigration assistance they were supposed to provide. Am. Compl. ¶ 5(a).

Defendants also argue that, "[b]ecause the Agreement did not take effect until he renders services specified therein and Plaintiff did not do so, the confession of judgment is of no moment." (Def. Br. at 11). It appears that defendants are arguing that the employment contracts were not breached because plaintiff never worked in the specific position identified in the contracts. We respond to that contract argument in Point IV below. For purposes of the TVPA claims, defendants' argument – that the $15,000 penalty was not enforceable because the employment agreements never came into effect – only establishes that the defendants threatened to enforce what they themselves concede is an unenforceable penalty.

Defendants also threatened to withdraw plaintiff's H-1B visa and warned that he would face deportation if he did not continue working for them. These threats also constituted threats of "serious harm" within the meaning of the TVPA. *See, e.g., Dann*, 652 F.3d at 1172 (threat to send non-immigrant back to Peru constituted threat of serious harm); *Calimlim*, 538 F.3d at 712 (immigrant victim "did not have an exit option: because the threats in her case involved her immigration status, she could not freely work

for another employer in order to escape the threatened harm"); *United States v. Djoumessi*, 538 F.3d 547, 552 (6th Cir. 2008) (threat to send victim back to Cameroon were coercive in light of victim's vulnerability as an illegal immigrant).

When defendants argue that, under ordinary circumstances, an employer is required by 8 C.F.R. § 214.2(h)(11) to withdraw an H-1B visa petition if the employee stops working, they ignore the extraordinary circumstances that they created in this case. In support of plaintiff's visa application, defendants submitted sworn statements under penalty of perjury to the USDOL and USCIS that they would pay plaintiff $35.53 per hour. Threatening to withdraw plaintiff's visa petition unless he worked for less than the wages defendants were legally required to pay does not constitute a legitimate warning. To the contrary, defendants' threats in violation of the labor and immigration laws constitute precisely the type of "improper threats or coercion" prohibited by the TVPA. *See United States v. Bradley*, 390 F.3d 145, 151 (1st Cir. 2004).

Defendants argue that the fact that they gave plaintiff a leave of absence to study for licensing exams indicates that he was always free to leave. (Def. Br. at 11). This argument misconstrues the complaint. As soon as plaintiff took the leave of absence, defendant Mrs. Beck "demanded that plaintiff return to work immediately or he would lose his H-1B visa." Am. Compl. ¶ 66. The Amended Complaint alleges that every time plaintiff was close to getting his license – an event that would end his dependency of defendants – Marissa Beck did everything possible to prevent that from happening. She harassed plaintiff while he was trying to study by instructing her assistant, Jeffrey Samonte, to call plaintiff with non-existent work assignments. When this did not deter

plaintiff from pursuing his studies for the licensing exam, she threatened to withdraw his H-1B visa. *Id.* ¶¶ 65-69.

Defendants argue that their campaign of threats did not violate the TVPA because "had it been successful, [it] would have compelled Plaintiff to return to work and not threaten his employers with a lawsuit." (Def. Br. at 11-12). This is a bizarre argument, to say the least. Taken to its logical conclusion, defendants' argument means that no claim can be brought under the TVPA if the employee seeks legal advice and commences or threatens to a lawsuit against his employer. If that were the law (which it is not), then no case could ever be brought under the TVPA.

**B.    All Defendants Are Liable for Violations of the TVPA**

As described above in Point I, all the corporate defendants had a contractual right to plaintiff's labor because they chose to identify "the Company" as Medical Dynamic "together with its affiliates" in the employment contracts. Defendants Marissa and Henry Beck benefited from this broad definition of plaintiff's "employer" by using plaintiff wherever it suited their personal interests, whether that be in their restaurants, in their staffing agencies, or even for the personal needs of their family members. Am. Compl. ¶ 8. Under these circumstances, all of the defendants ae liable under the TVPA.

**Point III**

**THE RICO CLAIMS ARE ADEQUATELY PLEADED**

The Amended Complaint alleges that defendants managed and controlled an association-in-fact of different corporate entities to carry out an illegal scheme that included submitting fraudulent labor and immigration applications to federal government agencies, with the objective of recruiting, maintaining, and profiting from an acquiescent,

submissive and compliant labor force of non-immigrant healthcare workers. Am. Compl., Third Claim for Relief, ¶¶ 107-84. The Amended Complaint further alleges that the individual defendants, Marissa and Henry Beck, used the different corporate entities to carry out this scheme after defendants Marissa Beck and APMI were permanently enjoined by this Court from violating federal labor laws.

## A.   Plaintiff Alleges a RICO Enterprise Controlled by RICO Persons

A RICO claim must allege "the existence of two distinct entities:  (1) a 'person'; and (2) an 'enterprise that is not simply the same 'person' referred to by a different name." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161-62 (2001). The RICO statute defines a person as "any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3). An "enterprise" is "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

There is no question that defendants Marissa Beck and Henry Beck are "persons," who are distinct from the corporate entities they own and control. The U.S. Supreme Court has held that an owner of corporations can be the RICO "person" when the corporations he owns and controls are the "enterprise," because the "corporate owner/employee, a natural person, is distinct from the corporation itself, a legally different entity with different rights and responsibilities due to its different legal status." *Cedric Kushner*, 533 U.S. at 163; *see also Nichols v. Mahoney*, 608 F. Supp. 2d 526, 531 (S.D.N.Y. 2009) ("plaintiffs allege that Mahoney, the principal of the EMC entities, is the 'person,' and the EMC entities are the enterprise. These allegations are sufficient to plead the existence of two distinct entities.").

There also is no question that defendants Marissa and Henry Beck can be both RICO "persons" and members of the association-in-fact that comprises the "enterprise." *See, e.g., Nichols*, 608 F. Supp. 2d at 533 (association-in-fact enterprise was a "distinct entity" where the "persons" were "Mahoney and EMC" and the entity was an association-in-fact comprised of Mahoney, EMC, and American Latin).

The only question with respect to RICO "persons" in this case is whether each corporate defendant considered separately can be a RICO person, while also being part of the association-in-fact enterprise. This appears to flow naturally from the holding in *Nichols*, but if this Court should rule that the corporate defendants may not be both "persons" and members of the association-in-fact, then plaintiff would request leave to amend the complaint to identify only defendants Marissa and Henry Beck as "persons."

The Second Circuit has held that "the existence of an association-in-fact is oftentimes more readily proven by what it does, rather than by abstract analysis of its structure. Thus, . . . proof of various racketeering acts may be relied on to establish the existence of the charged enterprise." *United States v. Coonan*, 938 F.2d 1553, 1559-60 (2d Cir. 1991). Here, the Amended Complaint alleges in detail how Marissa and Henry Beck engaged in criminal conduct, including submitting fraudulent applications under penalty of perjury to the USDOL and USCIS. The Amended Complaint also alleges the purpose of the association-in-fact enterprise – recruiting, maintaining, and profiting from an acquiescent, submissive, and compliant workforce of non-immigrant healthcare workers – and how they created the association-in-fact and directed its activities to that end.

The Amended Complaint also describes how the different entities functioned as a unit when it came to employing non-immigrant workers, fraudulently obtaining their working papers, coercing the workforce into submission, and hiding the defendants' illegal conduct from the government. For example, while defendant Medical Dynamic submitted plaintiff's visa applications as the formal "employer," defendants told plaintiff to make payments to defendant Oasis for fees that Medical Dynamic was prohibited by the immigration laws from charging. Am. Compl. ¶ 41. The restaurants served as a way station for non-immigrants whom defendants were still processing, and another entity, Gramercy Group, submitted financial records to the federal government in furtherance of their scheme. *Id.* ¶¶ 8, 54. Thus, contrary to defendants' arguments, this is not a case where plaintiff has relied on "group pleadings." (Def. Br. at 14).

**B.    The Amended Complaint Alleges More Than Two Predicate Acts**

*Social Security Fraud, 42 U.S.C. § 1383a:* Plaintiff alleges that defendants committed at least two predicate acts, as defined by 18 U.S.C. § 1961, by submitting at least two fraudulent applications to the Social Security Administration in violation of 42 U.S.C. § 1383a. Am. Compl. ¶¶ 146-48. In their moving papers, defendants do not dispute that plaintiff has adequately alleged violations of 42 U.S.C. § 1383a, or that such violations qualify as predicate acts of racketeering under 18 U.S.C. § 1961. These two predicate acts, standing alone, are sufficient to sustain plaintiff's claims of RICO violations.

*Trafficking and Forced Labor, 18 U.S.C. §§ 1584, 1589, 1590:* Plaintiff alleges that defendants violated Section 1584 of Title 18 of the U.S. Code by holding him in involuntary servitude, and that they violated Section 1589 by engaging in a scheme, plan

14

or pattern intended to cause him to believe that he would suffer serious harm if he stopped performing labor or services for defendants. Am. Compl. ¶¶ 119-26, 136. Plaintiff also alleges that defendants violated Section 1590 by recruiting him for labor or services in violation of Sections 1584 and 1589. *Id.* ¶¶ 127-30. Defendants' only response is that plaintiff cannot state a claim for violations of the TVPA. For the reasons set forth above in Point II, that argument is without merit.

***Foreign Labor Contracting Fraud, 18 U.S.C. § 1351a:*** Plaintiff alleges that defendants used false statements to recruit him to return to the United States to work for them after he returned to the Philippines. Am. Compl. ¶¶ 137-141. Defendants' only argument is that plaintiff was not recruited from a foreign country because he had previously been in the United States, and then went home. (Def. Br. at 15). They cite no legal authority, and plaintiff is aware of none, for the proposition that once an individual enters the United States and returns home to a foreign country, he can never again be recruited to come back to the United States in violation of 18 U.S.C. § 1351a.

***Visa Fraud, 18 U.S.C. § 1546:*** Defendants' argument that their multiple acts of immigration fraud do not constitute predicate acts because plaintiff actually received visas ignores the nature of their fraud. Plaintiff was promised (and paid for) valid visas, not visas procured by fraud. Plaintiff also was harmed because defendants' fraud – representing to the government that he would be paid $35.53 per hour, when defendants intended and actually paid him only $15 per hour – resulted in him being paid less than half the hourly rate the immigration laws required defendants to pay him.

***Mail and Wire Fraud, 18 U.S.C. §§ 1341 and 1343:*** Plaintiff has alleged specific instances when the defendants used the mails and wires: to transmit false

promises to induce him to leave the Philippines and work for them in the United States,
Am. Compl. ¶ 152(b); to transmit threats of serious harm to induce him to continue
working for them, *id.* ¶ 152(a); and to effectuate the termination of his H-1B visa on false
pretenses, *id.* ¶ 152(l). Each of these allegations is sufficient to state a claim for mail or
wire fraud.

Defendants argue that another category of fraud alleged in the Amended
Complaint – the use of the mail and wires to make false statements to the USDOL and
USCIS in connection with his working paper applications, *id.* ¶ 152(c)-(j) – may have
defrauded the federal government, but they did not defraud plaintiff because he actually
obtained the visas. Again, this argument misses the point that the defendants' acts of
obtaining visas by means of fraud deprived plaintiff of his right to have defendants take
"all reasonable steps" to ensure that he had valid visas.

***Extortion, New York Penal Law § 155.05(2)(e):*** Defendants argue that plaintiff
cannot satisfy the "harm" element of the New York extortion statute because he allegedly
"derived benefits" from their illegal conduct, such as the visas they obtained and his
compensation at more than the minimum wage. (Def. Br. at 17). These arguments
ignore the facts that (a) the visas actually put plaintiff at risk of deportation because
defendants obtained them by fraud; and (b) the immigration laws required that plaintiff
be paid $35.53 per hour, not the minimum wage or even the $15 per hour he was paid.

These arguments also ignore the allegations that plaintiff was deprived of the
thousands of dollars that he paid the defendants to obtain a valid visa, Am. Compl. ¶ 154,
that he was deprived of the thousands of dollars that defendants' required him to pay to
an English language school from which they received kickbacks, *id.* ¶ 156, that he was

16

threatened with loss of his immigration status, deportation, and a $15,000 lawsuit to enforce the Indentured Servant Clause, *id.* ¶ 159, and that he was threatened with harm to his career and reputation, *id.* ¶ 158.

Each of these harms, standing alone, is sufficient to satisfy the "harm" element of the New York extortion statute because these allegations establish that defendants engaged in conduct "calculated to harm another person materially with respect to his health, safety, business, calling, career, financial condition, reputation or personal relationships." N.Y. Penal Law § 155.05(2)(e)(ix).

## C.   The Amended Complaint Alleges a Pattern of Racketeering Activity

Defendants argue that plaintiff's allegations of a pattern of racketeering activity are "baseless" and constitute "conclusions of law." (Def. Mem. at 17-18). This argument ignores the numerous, detailed factual allegations in the Amended Complaint.

The Amended Complaint alleges that in 2008, "the U.S. Department of Labor issued a determination letter finding that [defendants Marissa Beck and APMI] had cheated employees out of almost $3 million in wages." Am. Compl. ¶ 2. "The U.S. Department of Labor also determined that Mrs. Beck had threatened employees with lawsuits and loss of their legal status – and actually commenced lawsuits against them – when they complained of her illegal conduct." *Id.* The Amended Complaint also alleges that the defendants required their employees to sign standard employment agreements, which contain the same Indentured Servant Clause and confession of judgment that the defendants required plaintiff to sign. *Id.* ¶ 64.

These factual allegations establish that the defendants' threats that plaintiff would face lawsuits and loss of legal status are part of a pattern of conduct by the defendants

that pre-dates the 2008 determination letter.  These are not, as defendants argue, "baseless" allegations or "conclusions of law."  These are allegations of fact fully supported by public records, including the determination letter and this Court's 2009 permanent injunction against defendants Marissa Beck and APMI.

The number of individuals involved in defendants' fraudulent scheme is also alleged with specificity.  The Amended Complaint alleges that "the Becks and their companies have filed more than 750 applications for H-1B visas since 2001, and many of those applications have been based on the Becks' willfully false and fraudulent submissions to the federal government."  *Id.* ¶¶ 7, 53.  It alleges that defendants "have submitted more than 969 Labor Condition Applications (LCAs) for H-1B visas since 2001 through different corporate entities they own and control, including defendants Medical Dynamic, Oasis, and APMI."  *Id.* ¶ 60.

The Amended Complaint also alleges that the defendants' specific scheme at issue in this lawsuit – fraudulently filing LCAs and visa petitions for individuals to work as "managers" at $35 or more per hour, when defendants never intended to employ any individuals in those positions or for those rates of pay – has affected numerous other non-immigrants.  Thus, the Amended Complaint alleges, "[i]n 2011 an 2012 alone, the Becks and their companies submitted at least 16 LCAs for Physical Therapy Rehab Managers, Physical Therapy Program Services Managers, and Rehab Managers," when they "never intended to employ, and never actually employed anyone" in those positions.  *Id.* ¶ 61.  In each of these cases, the defendants represented to USCIS that "these 'managers' would be paid a minimum of between $35.53 and $37.02 per hour," when the defendants "never

intended to pay such hourly rates to their employees and in fact paid these 'managers' at much lower rates." *Id.* ¶ 63.

These allegations of specific facts – which can be verified by reference to the defendants' own records and records on file with the federal government – establish that the defendants have engaged in a pattern of racketeering activity with a common purpose: "to profit from the fraudulent recruitment and forced labor and services of plaintiff and other non-immigrant employees, and to recruit, obtain, provide and maintain a consistent, submissive, and compliant non-immigrant labor force at their companies and clients." *Id.* ¶ 177.

Whether the pattern is viewed as closed-ended or opened-ended, these allegations are more than sufficient to establish that the defendants' predicate acts "'include a specific threat of repetition extending indefinitely into the future,'" . . . "form 'part of a long-term association that exists for criminal purposes,'" . . . and "constitute 'a regular way of conducting [an] ongoing legitimate business.'" *United States v. Aulicino*, 44 F.3d 1102, 1111 (2d Cir. 1995) (*quoting H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 242-43 (1989)).

**D.  The Amended Complaint Adequately Alleges a RICO Conspiracy**

Defendants' only independent argument for dismissal of the RICO conspiracy claim is an assertion that plaintiff fails to allege that each defendant manifested an agreement to commit two predicate acts in furtherance of the common purpose of the RICO enterprise. (Def. Br. at 18). This argument ignores the detailed factual allegations in the Amended Complaint.

The words and actions of the individual defendants, Marissa and Henry Beck, are described in detail throughout the complaint, from defendant Marissa Beck's submission of fraudulent documents to the federal government and numerous threats against plaintiff, *see, e.g.,* Am. Compl. ¶¶ 36-39, 46, 56-58, to defendant Henry Beck's agreement to let his wife sign his name to fraudulent documents and hide behind his perceived legitimacy, as well as his own submission of fraudulent documents to the federal government, *see, e.g., id.* ¶¶ 4, 36-39.

The Amended Complaint also alleges specifically how each of the corporate defendants also agreed to the RICO conspiracy.  For example, defendant Medical Dynamic agreed to submit fraudulent applications and petitions to federal government agencies.  *Id.* ¶¶ 142-147.  Defendant Oasis agreed to accept thousands of dollars from plaintiff to hide the fact that defendants were charging plaintiff immigration fees that the immigration laws prohibit them from charging.  *Id.* ¶ 41.  Defendants APMI and Grill 21 used false documents and employed plaintiff in positions and at rates of compensation inconsistent with the positions and rates of pay defendants reported to federal government agencies.  *Id.* ¶¶ 8, 144.  Defendant Gramercy Group allowed its bank account statements to be used in support of fraudulent visa petitions.  *Id.* ¶ 54.

"Considered as a whole, these allegations 'provide[] a substantial factual basis from which to infer an agreement among these defendants.'" *United States Fire Ins. Co. v. United Limousine Serv., Inc.*, 303 F. Supp. 2d 432, 453 (S.D.N.Y. 2004).

Lastly, there is no inconsistency between the allegation in Amended Complaint paragraph 188 that the agreement was entered into no later than 2008, and the allegation

in paragraph 174 that the predicate acts began in 2001.  (Def. Br. at 19).  Predicate acts

by some defendants in 2001 fall within a period described as "no later than 2008."

### E.        The Amended Complaint Alleges RICO Injuries

In order to establish a RICO injury, plaintiff must plead facts sufficient to show:

"(1) a violation of section 1962; (2) injury to his business or property; and (3) causation

of the injury by the violation."  *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21,

23 (2d Cir. 1990).  The violations of section 1962 are discussed above.  In this section,

plaintiff addresses the nature of his injuries and proximate cause.

Among the RICO injuries claimed by plaintiff are being:  "deprived of lawful

immigration status"; "forced to pay exorbitant and illegal fees"; "forced to work at wages

less than the prevailing wage reported to the federal government in [defendants'] H-1B

applications"; and "deprived of the right to be free from indentured servitude."  Am.

Compl. ¶ 183.  Each of these injuries is an injury to plaintiff in his business or property.

Each of these injuries was also proximately caused by the defendants' immigration fraud,

social security fraud, mail and wire fraud, extortion, and other RICO predicate acts.

Defendants' argument that plaintiff was deprived of his immigration status by his

own failure to return to work, and not by any RICO violation (Def. Br. at 20) looks only

at the final termination of plaintiff's employment and visa by defendants.  The injury,

however, occurred long before that final act when defendants placed plaintiff in a state of

involuntary servitude by a series of acts including threatening to enforce the Indentured

Servant Clause in the employment agreements, getting him a student visa instead of a

working visa, and putting him in a precarious position by fraudulently obtaining an H-1B

visa and social security card instead of the legitimate documents he paid them to obtain.

This is not, therefore, a case where plaintiff's sole injury is the loss of employment or future income because he refused to participate in an enterprise engaged in a pattern of racketeering activity that targeted third parties. *See DeSilva v. North Shore-Long Island Jewish Health Sys., Inc.*, 770 F. Supp. 2d 497, 515 (E.D.N.Y. 2011). This is a case where plaintiff was the direct target of the defendants' enterprise and pattern of racketeering activity.

Defendants' argument that plaintiff's claim of lost wages as a RICO injury is duplicative of his claim of lost wages under the FLSA (Def. Br. at 20) ignores a critical difference between the FLSA and RICO injuries. The FLSA claim seeks wages lost due to defendants' failure to pay the minimum wage for all hours worked and failure to pay overtime. The RICO claims for lost wages are based on a much higher rate of pay required by the immigration laws, and not required by the FLSA. Thus, the RICO injury includes being deprived of the $35.53 per hour required by the immigration laws. This is a different injury than plaintiff's claim for at least the minimum wage in his FLSA claim. The FLSA, therefore, does not "preempt" the RICO claim.

### Point IV

### THE BREACH OF CONTRACT CLAIMS ARE ADEQUATELY PLEADED

Defendants argue that plaintiff never satisfied condition precedents in the employment agreements because he did not work "in the positions specified in the Agreements." (Def. Br. at 20-21). The decision which "positions" were given to plaintiff, however, was completely within the control of the defendants. Plaintiff did not decide to work as a dishwasher, cook, or physical therapy aide. He worked in these positions because defendants unilaterally assigned him to these positions and refused to

give him the positions stated in the employment agreements.  Am. Compl. ¶ 230.

Whether characterized as estoppel or waiver, where, as here, the defendants decided not

to assign plaintiff to the positions specified in the agreements, the "condition precedent"

that he work in those positions is excused.  *Nassau Trust Co. v. Montrose Concrete*

*Prods. Corp.*, 56 N.Y.2d 175, 185, 451 N.Y.S.2d 663, 668 (1982) (*quoting Imperator*

*Realty Co. v. Tull*, 228 N.Y. 447, 457, 127 N.E. 263 (1920) (Cardozo, J.))

Defendants also argue that plaintiff failed to obtain a license to work as a Physical

Therapist.  The Amended Complaint, however, alleges numerous facts showing how the

defendants constantly called him back to work and harassed him with nonexistent

assignments when he was studying for licensing exams.  Am. Compl. ¶¶ 65-69.

Defendants cannot render it impossible for plaintiff to study for his exams and then claim

that the contract did not come into effect because he did not obtain a license.  *See Nassau*

*Trust*, 56 N.Y.2d at 185, 451 N.Y.S.2d at 668.

In addition, the "no license" argument applies only to the 2009 Contract.  As

defendants admitted in their submissions to the USCIS, no license was required to work

as a Rehab Manager.  Am. Compl. ¶ 62.  Since the 2011 contract was for plaintiff to

work as a Rehab Manager, *id.* ¶ 221, the absence of a license did not excuse defendants'

failure to place plaintiff in that position.

If anyone breached a condition precedent, it was the defendants.  They were

required to take "all reasonable steps" to obtain valid working papers for plaintiff, *id.* ¶¶

203, 221, which necessarily had to occur *before* he started working in the United States.

The Amended Complaint adequately alleges that defendants breached this obligation

when they filed false and fraudulent applications for visas and Social Security numbers. *Id.* ¶¶ 215-17, 234-36.

In any event, defendants waived any so-called conditions precedent, and are estopped from denying the enforceability of the contracts, because they selectively enforced the contracts to their own benefit. *See Nassau Trust*, 56 N.Y.2d at 185, 451 N.Y.S.2d at 668. In this regard, defendants threatened to enforce the Indentured Servant Clause in the contracts by suing plaintiff for $15,000 if he did not continue to work for less than half the wage that had been approved by the USDOL and USCIS. Am. Compl. ¶¶ 207, 225. They also represented to the outside world – including to the federal government – that they were paying plaintiff the wages stated in the contracts (and required by the labor and immigration laws) by creating false payroll records. *Id.* ¶ 226. Having chosen to enforce the employment contracts to their benefit, defendants cannot now deny their enforceability.

**Point V**

## THE FRAUD, UNJUST ENRICHMENT, AND QUANTUM MERUIT CLAIMS ARE NOT DUPLICATIVE OF THE BREACH OF CONTRACT CLAIMS

The Seventh Claim for Relief for common law fraud is premised on specific representations defendants made to plaintiff, including false representations that were made to induce him to come to New York City before any contracts were signed. Am. Compl. ¶¶ 240a-m. These false representations caused plaintiff to incur damages unrelated to the breach of contract claims, including "the time and expense of traveling from the Philippines and living in New York City" and "the loss of opportunities to work for other, legitimate employers." *Id.* ¶ 246.

24

The Eighth and Eleventh Claims for Relief seek damages for unjust enrichment and quantum meruit for plaintiff's labor and services "outside the scope of the 2009 Contract and the 2011 Contract." *Id.* ¶¶ 248, 265. For example, defendants may claim that work performed by plaintiff as a dishwasher and cook predated the formation of either contract. In that event, plaintiff is entitled to pursue a claim for unjust enrichment or quantum meruit.

The Tenth, Twelfth, and Thirteenth Claims for Relief are each pleaded in the alternative: "In the event it is determined that the . . . Contract did not commence . . . or . . . did not cover plaintiff's labor or services." *Id.* ¶¶ 259, 272, 280. Given defendants' argument that the employment contracts did not govern their relationship with plaintiff, they cannot be granted dismissal of these alternative claims on the grounds that the employment contracts did cover those relationships.

### Conclusion

For all the foregoing reasons, defendants' motion to dismiss should be denied in its entirety.

Dated: New York, New York
November 29, 2013

JOHN HOWLEY, ESQ.

By:  /s John J.P. Howley
     John J.P. Howley [JH 9764]
*Attorney for Plaintiff*
350 Fifth Avenue, 59th Floor
New York, New York  10118
(212) 601-2728
jhowley@johnhowleyesq.com