USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7/3/14

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - -X

LESTER LEE JAVIER,                              :

              Plaintiff,                      :

   -against-                                    :

MARISSA TEVES BECK *et al.*,                     :

             Defendants.                    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - -X

13cv2926

MEMORANDUM & ORDER

WILLIAM H. PAULEY III, District Judge:

        Plaintiff Lester Lee Javier brings claims for violations of the Fair Labor Standards Act ("FLSA"), the Trafficking Victims Protection Act ("TVPA"), and the Racketeer Influenced and Corrupt Organizations ("RICO") Act, as well as fraud, breach of contract, quantum meruit, and unjust enrichment.  Defendants Marissa Beck, Henry Beck, Medical Dynamic Systems Inc. ("MDS"), Oasis Professional Group Inc. ("Oasis"), Advanced Professional Marketing Inc. ("APM"), Grill 21 LLC, Pan de Sal LLC, and Gramercy Group Four LLC move to dismiss Javier's amended complaint ( "Complaint") for failure to state a claim.  For the reasons that follow, Defendants' motion is granted in part and denied in part.

## BACKGROUND

        The Complaint is a sprawling 287-paragraph jumble that is far from the "short and plain statement" prescribed by Rule 8.  Its unwholesome combination of prolixity and group pleading imposed unnecessary obstacles to this Court's analysis.  Nevertheless, the following facts are teased from the Complaint and assumed to be true for the purposes of this motion.

        Defendants Marissa Beck and her husband, Henry Beck, own or control the corporate defendants MDS, Oasis, APM, Grill 21, Pan de Sal, and Gramercy Group Four.

(Compl. ¶ 13.)  In 2008, the U.S. Department of Labor issued a determination letter reporting that Marissa Beck and APM had failed to pay nearly $3 million in wages.  (Compl. ¶ 2.)  The following year, District Judge Holwell permanently enjoined Marissa Beck to "make, keep, and preserve adequate records of [her] employees" and comply with FLSA rules.  (Compl. ¶ 35.)

In May 2011, Javier signed an employment agreement with MDS, which provided that MDS, "together with its affiliates," would employ Javier as a physical therapy rehab manager.  (Compl. ¶ 21.)  Javier would receive health insurance plus the higher of $35.53 per hour or the prevailing wage.  (Compl. ¶ 25.)  MDS would endorse Javier's H-1B visa application and take all reasonable steps to obtain authorization for Javier to work in the United States. (Compl. ¶ 22.)  Among other things, MDS was required to submit a Labor Condition Application demonstrating it would pay Javier the higher of the "actual wage" paid to other employees in his position or "the prevailing wage."  (Compl. ¶ 24.)  MDS would also pay all fees associated with Javier's H-1B application.  (Compl. ¶ 26.)

Javier alleges that MDS breached each of those contractual obligations.  Claiming there were no openings for a physical therapy rehab manager, the Becks employed Javier variously as a dishwasher, cook, and delivery boy at various Beck-owned businesses, paying him for fewer than half the hours he claimed on his timesheets.  (Compl. ¶ 8.)

Javier claims the Becks were deceptive in their visa submissions on his behalf. Marissa Beck forged her husband's[1] signature on an I-129 Petition certifying that Javier would work full time as a physical therapy rehab manager, that he would receive the higher of $35.53 per hour or the prevailing wage, and that he would not need a physical therapy license for the

---

[1] Henry Beck was, at the relevant times, CEO of MDS and Oasis.  (Compl. ¶ 14.)

position. (Compl. ¶¶ 36–38.) But according to the Complaint, the Becks had already signed a contract for Javier to work as a physical therapy aide at a clinic in New Jersey for $15 per hour. (Compl. ¶ 39.) And Javier's situation was not unique: in 2011 and 2012, the Becks and the corporate defendants submitted at least sixteen Labor Condition Applications for physical therapy manager positions but never actually employed anyone in those roles. Declaring the employees "managers" allowed the Becks to evade licensure requirements for individuals who work directly with patients. (Compl. ¶¶ 61–62.)

Defendants also charged Javier thousands of dollars for H-1B application fees, directing him to make payments to Oasis. (Compl. ¶ 41.) And as a condition of employment, the Becks required Javier and other employees to sign confessions of judgment for $15,000 in favor of the Becks and their companies. (Compl. ¶ 43.) The Becks frequently warned Javier that if he left their employment for any reason, he would be forced to pay them $15,000. (Compl. ¶ 44.) They also threatened to withdraw their H-1B petition on his behalf if Javier questioned their conduct or refused to work as assigned. (Compl. ¶ 45.)

Javier also asserts that back in January 2009 he signed a similar contract with the Becks. He alleges the Becks made numerous false representations on his student visa applications, forced him to work beyond the 20-hours-per-week ceiling, and, as a condition of employment, enrolled him in an English language school that paid kickbacks to the Becks. (Compl. ¶¶ 50–58.)

According to the Complaint, the Becks—through MDS, Oasis, and APM—have submitted more than 750 applications for non-immigrant visas and 969 Labor Condition Applications for H-1B visas since 2001. (Compl. ¶¶ 53, 60.) Javier alleges that the Becks required all their employees to sign contracts similar to his, including confessions of judgment.

(Compl. ¶ 64.)

In 2013, Javier obtained a leave of absence to study for a licensing exam. (Compl. ¶ 66.) During this time, Marissa Beck harassed Javier with fictitious assignments and threatened to terminate his H-1B application if he did not report for work. (Compl. ¶¶ 67–69.) Javier informed Marissa Beck that he was considering suing. She retaliated by withdrawing her H-1B submissions for Javier. (Compl. ¶ 70.) Marissa Beck did not, however, provide written notice of termination, notify United States Citizenship and Immigration Services ("USCIS") of the termination, or offer Javier transportation home to the Philippines. (Compl. ¶¶ 74–76.)

## DISCUSSION

### I.   Legal Standard

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). To determine plausibility, courts follow a "two-pronged approach." Iqbal, 556 U.S. at 679. "First, although a court must accept as true all of the allegations contained in a complaint, that tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Harris v. Mills, 572 F.3d 66, 72 (2d Cir. 2009). Second, a court determines "whether the 'well-pleaded factual allegations,' assumed to be true, 'plausibly give rise to an entitlement to relief.'" Hayden v. Paterson, 594 F.3d 150, 161 (2d Cir. 2010) (quoting Iqbal, 556 U.S. at 679). On a motion to dismiss, courts may consider "facts stated on the face of the complaint, in the documents appended to the complaint or incorporated in the complaint by reference, and . . . matters of which judicial notice may be taken." Allen v. WestPoint–Pepperell, Inc., 945 F.2d 40, 44 (2d Cir. 1991).

II.   FLSA

    A. Overtime and Unpaid Wages

        The FLSA requires employers to pay employees the federal minimum wage for all hours worked, 29 U.S.C. § 206(a), and "a rate not less than one and one-half times the regular rate" for hours worked in excess of forty hours per week,  29 U.S.C. § 207(a)(1); Lundy v. Catholic Health Sys. of Long Island, Inc., 711 F.3d 106, 114 (2d Cir. 2013).  During a continuous workday, activities that occur after the beginning of the employee's first principal activity and before the end of the employee's last principal activity are generally covered under the FLSA.  IBP, Inc. v. Alvarez, 546 U.S. 21, 37 (2005).  For example, "[i]n IBP, the Supreme Court held that the time spent by slaughterhouse employees before and after their shifts walking between their locker rooms—where they engaged in the principal activities of donning and doffing their protective gear—and the slaughterhouse floor was part of the continuous workday and therefore compensable under the FLSA." Kuebel v. Black & Decker Inc., 643 F.3d 352, 359 (2d Cir. 2011).  However, administrative tasks are not compensable when they could be performed at any time, but the employee chooses to perform them after work hours.  Kuebel, 643 F.3d at 360–61.  Similarly, classes are not "working time" if they are (1) outside regular working hours, (2) voluntary, (3) not directly related to the employee's job, and (4) the employee does not perform any productive work during attendance.  29 C.F.R. § 785.27.

        Here, Javier has pled the approximate dates and numbers of hours he worked for which he was not compensated at either the minimum wage or the overtime rate.  (See Compl. ¶¶ 89(a)–(m).)  These hours reflect time spent on "marketing, administrative, and other tasks" that are detailed in the Complaint, including the filing of attendance reports, following up on payment invoices, and selling additional services to clients.  (Compl. ¶ 84.)  Whether these tasks could

have been performed during regular work hours is a question of fact that should not be decided on a motion to dismiss. The alleged hours also reflect uncompensated time spent in an English language training school, which the Defendants required Javier to attend even though he spoke English. (Compl. ¶ 85.) If, as the Complaint alleges, the class was mandatory, then Javier's attendance was compensable.

Defendants argue that Javier's time sheets refute his allegations of unpaid hours and overtime. But FLSA plaintiffs are not always bound by their timesheets, Kuebel, 643 F.3d at 363, and a dispute as to the facts underlying the Complaint is not appropriate on a motion to dismiss. Javier has sufficiently pled a claim for overtime under the FLSA.

Defendants also argue that Javier has no claim for unpaid wages under the FLSA because he made $15 per hour, well more than minimum wage. While "deductions for board, lodging, or other facilities may be made in nonovertime workweeks even if they reduce the cash wage below minimum wage," 29 C.F.R. § 531.36(a),[2] visa costs are an employment necessity, and employers who pass those costs on to employees "must provide reimbursement up to the point where the minimum wage is met." Arriaga v. Fla. Pac. Farms, L.L.C., 305 F.3d 1228, 1244 (11th Cir. 2002). Javier alleges that Defendants required him to pay thousands of dollars in visa application and school fees. (Compl. ¶¶ 50, 52.) Accepting the allegations in the Complaint as true, these fees were employment necessities and must be deducted from Javier's wage. A dispute as to the extent of these fees cannot be resolved on a motion to dismiss.[3]

---

[2] Such items may not reduce the cash wage below minimum wage, however, where they are furnished to the employee at a profit. 29 C.F.R. § 531.36(a)

[3] The immigration fees were at most $4,325, (Compl. ¶ 26), and the Complaint does not include an estimation of school fees more specific than "thousands of dollars[,]" (Compl. ¶ 52). The fees would likely need to be very substantial before the deductions brought Javier's pay rate below minimum wage.

B. Corporate Employers

"When two or more entities operate as joint employers of a given worker, each employer is jointly and severally liable to those affected employees for the FLSA violations of all other joint employers." Paz v. Piedra, No. 9 Civ. 03977 (LAK)(GWG), 2012 WL 121103, at *5 (S.D.N.Y. Jan. 12, 2012) (citations omitted). Joint employment "arises when the employee 'performs work which simultaneously benefits two or more employers' and 'one employer is acting directly or indirectly in the interest of the other employer (or employers) in relation to the employee.' Ansoumana v. Gristede's Operating Corp., 255 F. Supp. 2d 184, 188–89 (S.D.N.Y. 2003) (citing 29 C.F.R. § 791.2(b)). And "determining whether two entities jointly employ a particular worker involves the same [analysis] as is required to determine whether a single entity is the employee of a worker." Paz, 2012 WL 121103, at *5.

"When it comes to 'employer' status under the FLSA, control is key." Lopez v. Acme Am. Envtl. Co., No. 12 Civ. 511 (WHP), 2012 WL 6062501, at *3 (S.D.N.Y. Dec. 6, 2012). The Second Circuit has set out different tests to aid in determining whether an employment relationship exists under the FLSA. Carter v. Dutchess Community College adopted a four-factor test for "formal control" over an employee: "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." 735 F.2d 8, 12 (2d Cir. 1984) (quoting Bonnette v. Cal. Health & Welfare Agency, 704 F.2d 1465, 1470 (9th Cir.1983)).

In addition, an entity may functionally control workers even when it does not formally control them. Lopez, 2012 WL 6062501, at *3. Zheng v. Liberty Apparel Co. articulates a set of factors for "functional control" over an employee. These include "(1) whether

the [alleged employer's] premises and equipment were used for the plaintiffs' work; (2) whether the [subcontractors] had a business that could or did shift as a unit from one putative joint employer to another; (3) the extent to which plaintiffs performed a discrete line-job that was integral to [the alleged employer's] process of production; (4) whether responsibility under the contracts could pass from one subcontractor to another without material changes; (5) the degree to which the [alleged employer] or [its] agents supervised plaintiffs' work; and (6) whether plaintiffs worked exclusively or predominantly for the [alleged employer]." 355 F.3d 61, 72 (2d Cir. 2003).

Here, Javier alleges he signed a contract stating his employer was MDS "together with its affiliates[,]" and those affiliates were Oasis, APM, Grill 21, Pan de Sal, and Gramercy Group Four. (Compl. ¶ 21.) He also alleges he paid visa application fees to Oasis. (Compl. ¶ 41.) He does not, however, allege that each of the corporate defendants supervised his schedule, determined his rate of pay, or maintained his employment records. In the 278-paragraph Complaint, there are remarkably few details as to Javier's relationships with each of the corporate defendants. The only persons identified as responsible for Javier's schedule are the Becks and their assistant, Jeffrey Samonte. (See Compl. ¶¶ 67–69.) Under the <u>Carter</u> factors, MDS—which was named on the contract and maintained records of Javier's hours and pay—was his employer.

Moreover, the Complaint alleges that Javier worked directly for Grill 21, APM, and the Becks' relatives. (Compl. ¶ 8.) While it is not clear whether he used the premises of any corporate defendants except MDS and Grill 21, and the Complaint does not allege who supervised Javier as he worked for one or another corporate defendant, the allegation that Defendants were able to shuffle him interchangeably among positions strongly suggests informal

control.

Despite its breadth, the Complaint is bereft of substantive allegations regarding Oasis, Pan de Sal, and Gramercy Group Four. The Complaint mentions that Defendants directed Javier to make payments to Oasis and used Gramercy Group Four's finances as part of a visa application, but these isolated details do not show control. Therefore, Javier has not stated an FLSA claim against Oasis, Pan de Sal, or Gramercy Group Four as joint employers.

   C.  Individual Defendants

"[T]o be an 'employer,' an individual defendant must possess control over a company's actual 'operations' in a manner that relates to a plaintiff's employment." Irizarry v. Catsimatidis, 722 F.3d 99, 109 (2d Cir. 2013). "A person exercises operational control over employees if his or her role within the company, and the decisions it entails, directly affect the nature or conditions of the employees' employment." Irizarry, 722 F.3d at 110; see also Herman v. RSR Sec. Servs. Ltd., 172 F.3d 132, 139 (2d Cir. 1999).

Here, the Becks are alleged to have submitted immigration papers as Javier's employers, assigned Javier to various positions, controlled compensation, and threatened adverse employment action. (See Compl. ¶¶ 36, 39, 45, 67.) Javier has stated a claim against them as individual employers.

III.   Trafficking Victims Protection Act

The TVPA punishes those who "knowingly provide[] or obtain[] the labor or services of a person . . . by means of force[,] . . . serious harm[,] . . . abuse or threatened abuse of law or legal process[,] . . . or . . . by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person . . . would suffer serious harm . . . ." 18 U.S.C. § 1589(a). "The term 'abuse or threatened abuse of law or

9

legal process' means the use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action." 18 U.S.C. § 1589(c).[4] And serious harm includes "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid that harm." 18 U.S.C. § 1589(c)(2). For example, "it is possible that threatening . . . an immigrant with deportation could constitute the threat of legal coercion that induces involuntary servitude." United States v. Kozminski, 487 U.S. 931, 948 (1988).

Congress passed the Victims of Trafficking and Violence Protection Act of 2000 ("VTVPA 2000"), Pub. L. No. 106–386, 114 Stat. 1464, "to correct what they viewed as the Supreme Court's mistaken holding in [Kozminski,]" which "limited the definition of involuntary servitude to 'physical' or 'legal' coercion." United States v. Dann, 652 F.3d 1160, 1170 (9th Cir. 2011). The means of modern-day traffickers are "increasingly subtle." H.R. Rep. No. 106–939, at 101, 2000 U.S.C.C.A.N. 1380, 1392–93 (2000) (Conf. Rep.). Congress defined "harm" broadly in order to "reach cases in which persons are held in a condition of servitude through nonviolent coercion." Dann, 652 F.3d at 1170 (quoting 22 U.S.C. § 7101). In United States v. Dann, the Ninth Circuit held that the threat that a non-immigrant would owe $7,500 to her employer if she quit, leaving her without "money to leave or live," constituted a threat of

---

[4] Courts "must distinguish between improper threats or coercion and permissible warnings of adverse but legitimate consequences." Headley v. Church of Scientology Int'l, 687 F.3d 1173, 1180 (9th Cir. 2012) (internal quotation marks and citation omitted).

"serious harm." 652 F.3d at 1171.

Here, Javier alleges the Becks threatened to enforce a $15,000 confession of judgment if he left their employ, failed to report for work, or challenged the legality of their conduct. (Compl. ¶¶ 43–45.) This is twice the amount the Ninth Circuit found coercive in Dann and represented six months' gross wages at Javier's effective $15 per hour pay rate. (Compl. ¶ 44.) The Becks also threatened to withdraw Javier's visa application if he failed to report for work during a leave of absence. (Compl. ¶ 69.) Although it is not clear from the Complaint that these penalties would have left Javier without "money to leave or live," Dann, 652 F.3d at 1171, they appear sufficient at this stage to satisfy the TVPA's "serious harm" requirement.

Defendants argue that the $15,000 confession of judgment did not represent a threat to Javier because Javier never worked as a physical therapy rehab manager, so the contract never took effect. (Pl. Opp. 11.) This argument is unavailing in light of Javier's allegation that Marissa Beck "repeatedly threatened [him] that he would owe the defendants $15,000 if he obtained employment with anyone else or otherwise left the defendants' employ." (Compl. ¶ 93.) Regardless of whether the contract was in fact enforceable, the Complaint alleges that the Defendants used it as a threat to obtain Javier's continued services.

Defendants also argue that threatening to withdraw Javier's visa application was legitimate because any employer would be required by law to withdraw a visa application on behalf of a terminated employee. (Pl. Opp. 11.) But this ignores the context of the threat. Javier alleges that Defendants promised him a job as a physical therapy rehab manager paying $35.53 per hour, then threatened to withdraw his visa application if he did not report to other jobs where he effectively earned $15 per hour. (Compl. ¶¶ 25, 33.) Javier has sufficiently pled a claim under the TVPA.

IV.   RICO

          To state a civil RICO claim under section 1962(c), a plaintiff must allege: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." Cintas Corp. v. Unite Here, 601 F. Supp. 2d 571, 577 (S.D.N.Y. 2009) (citing Sedima S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 (1985)).   In addition, the Federal Rules of Civil Procedure impose a heightened pleading standard on civil RICO claims sounding in fraud.  See Fed. R. Civ. P. 9(b); First Capital Asset Mgmt., Inc. v. Satinwood, Inc., 385 F.3d 159, 178 (2d Cir. 2004).  Under Rule 9(b), claims sounding in fraud must be pled with particularity and "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Rombach v. Chang, 355 F.3d 164, 170 (2d Cir. 2004).  The alleged RICO predicates include fraud in connection with foreign labor contracting, immigration fraud, and social security fraud.  (Compl. ¶¶ 131–52.)

A.  RICO Standing

          "The RICO statute grants standing to '[a]ny person injured in his business or property by reason of a violation of section 1962.'" Lerner v. Fleet Bank, N.A., 318 F.3d 113, 120 (2d Cir. 2003) (quoting 18 U.S.C. § 1964(c)).  Section 1962 prohibits "racketeering activity."  18 U.S.C. § 1962.  Here, Javier alleges injuries flowing from Defendants' violation of the TVPA.  (Compl. ¶ 119.)  Violations of the TVPA constitute "racketeering activity."  18 U.S.C. § 1961(1); Tanedo v. E. Baton Rouge Parish Sch. Bd., No. 10 Civ. 1172 (JAK), 2012 WL 5378742, at *9 (C.D. Cal. Aug. 27, 2012) (finding TVPA claim was a sufficient injury to confer RICO standing).  Therefore, Javier has sufficiently pled RICO standing.

B.  RICO Enterprise

          "[T]o establish liability under § 1962(c) one must allege and prove the existence

of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 161 (2001). A RICO "person" is "any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3). A RICO "enterprise" is "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The Supreme Court has held that a corporate owner/employee, even if the sole owner of the corporation, is distinct from the corporation itself and violates RICO when he or she uses the corporation as a vehicle to commit racketeering acts. Cedrick Kushner Promotions, 533 U.S. at 163–64. A corporate entity may also be a RICO "person" "where it associates with others to form an enterprise that is sufficiently distinct from itself." Securitron Magnalock Corp. v. Schnabolk, 65 F.3d 265, 263 (2d Cir. 1995).

"Where a plaintiff's claim turns on the existence of an association-in-fact enterprise, the plaintiff must allege an enterprise with 'at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose.'" Neiman Marcus Grp., Inc. v. Dispatch Transp. Corp., No. 09 Civ. 6861 (NRB), 2011 WL 1142922, at *7 (S.D.N.Y. Mar. 17, 2011) (quoting Boyle v. United States, 556 U.S. 938, 946 (2009)).

Here, Javier alleges that each of the Defendants is a distinct RICO "person[]," (Compl. ¶ 114), and their association-in-fact is a RICO enterprise, (Compl. ¶ 110). The alleged purpose of the enterprise is to "recruit, obtain, process, and provide non-immigrant healthcare workers to work at defendants' businesses . . . to maintain an acquiescent labor force; to solicit and collect money . . . in connection with procuring . . . visas[] and employment opportunities; and to profit from the[ir] labor and services . . . ." (Compl. ¶ 116.). The Complaint is spare

13

regarding the interrelationship of the various corporate defendants and their roles in the enterprise, but the unity of ownership and purpose across a four-year period is sufficient to allege the existence of a RICO enterprise.

    C.    <u>RICO Pattern</u>

        To plead a pattern of racketeering activity, a plaintiff must allege two or more related predicate acts of racketeering occurring within a ten-year period that "amount to, or . . . otherwise constitute a threat of, continuing racketeering activity." <u>H.J. Inc. v. Nw. Bell Tel. Co.</u>, 492 U.S. 229, 239 (1989); <u>see also</u> <u>GICC Cap. Corp. v. Tech. Fin. Grp., Inc.</u>, 67 F.3d 463, 465 (2d Cir. 1995). The plaintiff "need not demonstrate injury to himself from each and every predicate act making up the RICO claim[,]" <u>Corley v. Rosewood Care Ctr.</u>, 388 F.3d 990, 1004 (7th Cir. 2004), but the predicate acts must be "sufficiently serious [in] dimension and degree, both qualitatively and quantitatively, not only to cause the private injury the victim claims, but to produce some public harm or pose a societal threat that extends beyond the narrow interests of a few victims." <u>Gross v. Waywell</u>, 628 F. Supp. 2d 475, 490 (S.D.N.Y. 2009).

        Here, Javier alleges nine predicate acts committed against him and others: (1) forced labor in violation of 18 U.S.C. § 1589; (2) trafficking in persons with respect to forced labor in violation of 18 U.S.C. § 1590; (3) holding employees in involuntary servitude in violation of 18 U.S.C. § 1584; (4) conspiracy to prevent Javier from exercising his 13th Amendment Rights in violation of 18 U.S.C. § 241; (5) fraud in connection with foreign labor contracting in violation of 18 U.S.C. § 1351(a); (6) immigration fraud in violation of 18 U.S.C. § 1546; (7) making false statements in connection with the social security laws in violation of 42 U.S.C. § 1383(a); (8) mail and wire fraud in violation of 18 U.S.C. § 1341 and 18 U.S.C. § 1343; and (9) extortion in violation of New York Penal Law § 155.05(2)(e). (Compl. ¶¶ 119–173.)

In addition to the harms he claims to have suffered under the 2009 and 2011 contracts, Javier pleads that since 2001 the Defendants have induced hundreds of other non-immigrant healthcare workers to sign contracts with large confessions of judgment, (Compl. ¶ 43), and submitted fraudulent immigration documents on behalf of those workers, (Compl. ¶¶ 60–62). The alleged scheme, encompassing hundreds of victims and spanning more than a decade, meets the RICO pattern requirement. (Compl. ¶ 174.) Javier has pled a RICO claim.

V.    RICO Conspiracy

"To establish the existence of a RICO conspiracy, a plaintiff must prove the existence of an agreement to violate RICO's substantive provisions" and "prove that if the agreed-upon predicate acts had been carried out, they would have constituted a pattern of racketeering activity." Cofacrèdit, 187 F.3d at 244–45 (internal quotation marks and citations omitted). "Plaintiffs must allege some factual basis for a finding of a conscious agreement among the defendants." Angermeir v. Cohen, No. 12 Civ. 55 (KMK), 2014 WL 1613016, at *14 (S.D.N.Y. Mar. 27, 2014) (quoting Picard v. Kohn, 907 F. Supp. 2d 392, 400 (S.D.N.Y. 2012)). This agreement "can be inferred from circumstantial evidence of the defendant's status in the enterprise or knowledge of wrongdoing." Angermeir, 2014 WL 1613016, at *14. Further, Rule 9(b) does not apply to a conspiracy claim, which is analyzed under the "more liberal pleading requirements of Rule 8(a)." Hecht, 897 F.2d at 26 n.4.

Here, the Complaint alleges in broad strokes that the Defendants employed, received money from, or submitted fraudulent immigration documents as part of an on-going scheme to recruit and exploit non-immigrant healthcare workers. The Complaint also alleges that the Becks own or control the corporate defendants. Although insufficient to establish that each of the corporate defendants jointly employed Javier, these allegations, if true, are sufficient

to conclude that the Defendants—except Pan de Sal, for which no role in the RICO scheme is alleged—knowingly participated in a pattern of RICO activity. Therefore, Javier has sufficiently pled a RICO conspiracy.

## VI.   Breach of Contract

"To recover for breach of contract under New York law, a plaintiff must prove (a) the existence of a contract between plaintiff and defendant; (b) performance of the plaintiff's obligations under the contract; (c) breach of the contract by the defendant; and (d) damages to the plaintiff caused by the defendant's breach." Harkabi v. SanDisk Corp., 891 F. Supp. 2d 527, 543 (S.D.N.Y. 2012).

As an initial matter, Defendants contend that Javier cannot plead breach of contract against Oasis, APM, Grill 21, Pan de Sal, Gramercy Group Four, or any of the individual Defendants because the only party to the employment contracts was MDS. Under most circumstances, a non-party to a contract is not bound by the contract. Abraham Zion Corp. v. Lebow, 761 F.2d 93, 103 (2d Cir. 1985). However, New York law permits a plaintiff to "pierce the corporate veil" and sue a non-signatory for breach of contract when the non-signatory is an alter ego of one or more signatories. Kaliner v. Mt. Vernon Monetary Mgmt. Corp., No. 07 Civ. 4643 (LMM), 2008 WL 4127767, at *2 (S.D.N.Y. Sept. 3, 2008). In order to pierce the corporate veil, a party must establish that "(1) the owners exercised complete domination of the corporation in respect to the transaction attacked; and (2) that such domination was used to commit a fraud or wrong against the plaintiff which resulted in the plaintiff's injury." JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc., 306 F. Supp. 2d 482, 485 (S.D.N.Y. 2004); see also Freeman v. Complex Computing Co., 119 F.3d 1044, 1052 (2d Cir. 1997).

The Complaint alleges the Becks had their personal assistant assign Javier work, move him from workplace to workplace and compel him to work for the Becks' relatives. (Compl. ¶ 8.)  The Becks also submitted fraudulent immigration forms on his behalf and involved several of their companies in the application process.  (Compl. ¶¶ 41, 54.)  Thus, according to the Complaint, the Becks personally controlled Javier's work assignments and his immigration submissions, and they used this control to deprive him of a promised position, wages, and valid immigration documents.  This is sufficient to plead the contract claim against Marissa and Henry Beck.

As to the corporate defendants, Javier argues that no theory of alter ego liability is necessary because they are in fact parties to the contracts. The contracts state that Javier's employer is MDS "together with its affiliates," and those affiliates are the corporate defendants under the common ownership of the Becks.  (Compl. ¶ 21.)  This raises an issue of fact that cannot be decided on a motion to dismiss.

Defendants argue that Javier has not alleged his own performance of either the 2009 or the 2011 employment contract. Under the 2009 contract, Javier's employment does not begin until he "renders actual services to the Company as a duly Licensed Physical Therapist under New York State Law." (Montoya Decl. Ex. A, at ¶ 1.)[5]  Similarly, under the 2011 contract, Javier's employment does not begin until he "renders actual services to the Company as a . . . Physical Therapy Rehab Manager under New York State Law." (Montoya Decl. Ex. B, at ¶ 1.)  Javier does not allege that he obtained the necessary licensing for the 2009 contract or worked either as a licensed physical therapist or a physical therapy rehab manager.

---

[5] Javier's contracts are incorporated in the complaint by reference and are subject to examination on this motion.  See WestPoint–Pepperell, 945 F.2d at 44.

This failure of a condition precedent does not doom Javier's claim for three reasons. First, Defendants' obligation to provide immigration assistance arose from execution of the contract and not Javier's employment status or licensure. (See Montoya Decl. Ex. A, at ¶ 6 ("Subsequent to the execution of this Agreement, the Company shall take all reasonable steps to ensure the Employee obtains the relevant authorizations and meets the requirements necessary to legally commence work in the United States . . . .").) A factfinder could conclude that in securing visas by fraud, Defendants breached their obligation to take "all reasonable steps . . . to maintain Employee's legal status to work in the United States."

Second, Javier alleges that Defendants frustrated his performance of the contract. "He who prevents a thing from being done may not avail himself of the non-performance which he has, himself, occasioned . . . ." Realty Co. v. Tull, 127 N.E. 263, 266 (N.Y. 1920) (Cardozo, J.). Defendants determined where Javier worked and cannot dismiss Javier's claim on the basis that he failed to work where they did not assign him.[6]

Third, Defendants waived any condition precedent by selectively enforcing other parts of the contract. For example, Defendants repeatedly threatened Javier with the $15,000 confession of judgment. (Compl. ¶¶ 207, 225.) While "[w]aiver of a contractual condition is not lightly presumed under New York Law [and] the intent to waive must be unmistakably manifested[,]" Jofen v. Epoch Biosciences, Inc., No. 01 Cv. 4129 (JGK), 2002 WL 1461351, at *7 (S.D.N.Y. July 8, 2002), the Complaint contains sufficient factual allegations to establish

---

[6] Javier also suggests his failure to obtain a physical therapist's license was attributable to Defendants' harassment while he studied for the licensure exam. (Pls. Opp. 23.) But the harassment occurred in 2013, (Compl. ¶¶ 65–69), after Javier had already signed a new contract supplanting the 2009 agreement. The Complaint does not allege facts to support the inference that it was Defendants who prevented Javier from obtaining a physical therapy license during the life of the 2009 contract.

waiver. Javier's breach of contract claims cannot be dismissed based on non-performance. Javier has sufficiently pled breach of the immigration assistance and wage terms in the 2009 and 2011 contracts.[7]

## VI.   Quasi-Contract

Javier asserts a claim for unjust enrichment and quantum meruit.[8]  Under New York law, unjust enrichment and quantum meruit claims "are analyzed together as a single quasi-contract claim." Gutkowski v. Steinbrenner, 680 F. Supp. 2d 602, 613 (S.D.N.Y. 2010).  In order to state a claim for quantum meruit or unjust enrichment, a plaintiff must plead that (1) the defendant was enriched; (2) the enrichment was at the plaintiff's expense; and (3) the circumstances were such that equity and good conscience requires defendants to make restitution. Zeising v. Kelly, 152 F. Supp. 2d 335, 345 (S.D.N.Y. 2001).

Here, Javier has pled that the Defendants accepted his labor under the 2009 and 2011 contracts, as well as some labor outside of those contracts, but did not pay him the value of his labor.  With the caveats that claims covered by the 2009 and 2011 contracts are pre-empted unless those contracts are found unenforceable, see Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp., 418 F.3d 168, 175 (2d Cir. 2005), and any claims to minimum wage or overtime are pre-empted by the FLSA, Ouedraogo v. A-1 Intern. Courier Serv., Inc., No. 12 Civ. 5651 (AJN), 2013 WL 3466810, at *6 (S.D.N.Y. July 8, 2013), Javier has stated a quasi-

---

[7] His breach of contract claim cannot rest, however, on the allegation that "Defendants breached the 2011 Contract . . . by failing and refusing to employ and compensate plaintiff for at least 40 hours every week," (Compl. ¶ 231), because the 2011 contract makes no guarantee that Javier would work 40 hours per week, (see Montoya Decl. Ex. B).

[8] Where the complaint asserts claims on theories of both contract and quantum meruit and there is a genuine dispute as to the existence of a contract, the plaintiff need not make a pretrial election between these theories; he is entitled to have the case submitted to the jury on both theories. Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir. 1996).

contract claim.

VII.    Fraud

Under New York law, to state a claim for fraud a plaintiff must demonstrate: (1) a misrepresentation or omission of material fact; (2) which the defendant knew to be false; (3) which the defendant made with the intention of inducing reliance; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff. Wynn v. AC Rochester, 273 F.3d 153, 156 (2d Cir. 2001). In addition, claims of fraud must be pled with particularity and "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Rombach v. Chang, 355 F.3d 164, 170 (2d Cir. 2004).

Critically, "[a] cause of action for fraud does not generally lie where the plaintiff alleges only that the defendant entered into a contract with no intention of performing." Grappo v. Alitalia Linee Aeree Italiane, S.p.A., 56 F.3d 427, 434 (2d Cir. 1995) (citation omitted). "[W]here a fraud claim arises out of the same facts as plaintiff's breach of contract claim, with the addition only of an allegation that defendant never intended to perform the precise promises spelled out in the contract between the parties, the fraud claim is redundant and plaintiff's sole remedy is for breach of contract." Telecom Int'l Am., Ltd. v. AT&T Corp., 280 F.3d 175, 196 (2d Cir. 2001) (quoting Sudul v. Computer Outsourcing Servs., 868 F. Supp. 59, 62 (S.D.N.Y. 1994)); see also Stillman v. InService Am., Inc., No. 05 Civ. 6612 (WHP), 2008 WL 2156724, at *3 (S.D.N.Y. 2008). "Rather, to state a fraud claim co-existent with an alleged breach of contract, Plaintiff must: '(i) demonstrate a legal duty separate from the duty to perform under the contract; (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as

20

contract damages.'"  Stillman, 2008 WL 2156724, at *3 (quoting Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc., 98 F.3d 13, 20 (2d Cir. 1996) (citations omitted)).

Javier alleges the Defendants made several different false representations.  In November 2008, Marissa Beck told Javier that she would employ him as a physical therapist, arrange for him to work legally in the United States, and pay the costs involved in obtaining a visa for him.  (Compl. ¶¶ 240(a)–(d).)  Javier alleges these representations caused injury distinct from his contract damages because he relied on them when he bought a plane ticket and flew to New York to work for Defendants.  (Compl. ¶ 246.)

In July 2009, "defendants Marissa Beck, Henry Beck, Medical Dynamic, Oasis and APMI, directly and through their employee Jeffrey Samonte," told Javier that he would work 40 hours per week if he left the Philippines and came to New York.  (Compl. ¶ 240(i).)  They also told him that they would obtain all necessary visas and work authorizations for him. (Compl. ¶ 240(k).)  Group pleading of Defendants does not satisfy the requirement to specifically identify the maker of an alleged misrepresentation.  However, even assuming Rule 9(b) were satisfied, the alleged misrepresentations could not support a fraud claim because they are the contractual representations in the January 2009 agreement, for which Javier's remedy is breach of contract.  See Montoya Decl. Ex. A.[9]  In sum, Javier's fraud claim is a claim that the Defendants did not intend to honor the contract.

Finally, in January 2010, Marissa Beck told Javier that he could work legitimately in the United States on a student visa if he attended an English language school.  (Compl. ¶¶ 240(l)–(m).)  These representations too echo Defendants' contractual promise to "take all

---

[9] The Complaint offers no explanation as to why Javier's relocation from the Philippines was in question six months after he had contracted to work in New York City.

reasonable steps to ensure [Javier] obtains the relevant authorizations and meets the requirements necessary to legally commence work in the United States." Montoya Decl. Ex. A. Any injuries Javier suffered from relying on them are indistinguishable from the injuries alleged in his breach of contract claim. For this reason, Javier's fraud claim is dismissed except as to the alleged November 2008 misrepresentations concerning payments for visa applications.

CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is granted in part and denied in part. Javier's FLSA claims against Oasis, Pan de Sal, and Gramercy Group Four are dismissed. Javier's RICO and RICO conspiracy claims against Pan de Sal are dismissed. Javier's fraud claims against all Defendants except Marissa Beck, for her November 2008 representations, are dismissed. In all other respects, Defendants' motion to dismiss is denied. The Clerk of Court is directed to terminate the motion pending at ECF No. 22.

Dated: July 3, 2014
       New York, New York

SO ORDERED:

WILLIAM H. PAULEY III
U.S.D.J.

*Counsel of Record*:

John J. P. Howley, Esq.
Law Offices of John Howley
350 5th Avenue, 59th Floor
New York, NY 10118
*Counsel for Plaintiff*

Concepcion A. Montoya, Esq.
Hinshaw & Culbertson LLP
780 Third Avenue
New York, NY 10017
*Counsel for Defendants*